Jessica McKinlay (Cal. Bar No. 282743)
**BIALSON, BERGEN & SCHWAB**
A Professional Corporation
830 Menlo Avenue, Suite 201
Menlo Park, California 94025
Telephone: 650/857-9500
Facsimile: 650/494-2738
E-mail jessica@bbslaw.com

Attorneys for Pinterest

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>ERIN ELIZABETH BURKE,<br><br>     Debtor and Debtor in Possession | ) Case No.  2:24-bk-14882-BB<br>)<br>) Chapter 11<br>)<br>) **PINTEREST'S OPPOSITION TO**<br>) **DEBTOR'S MOTION OBJECTING**<br>) **TO CERTAIN PROOFS OF CLAIM;**<br>) **DECLARATION OF JESSICA**<br>) **MCKINLAY IN SUPPORT;**<br>) **EXHIBIT A**<br>)<br>) Hearing<br>) Date:  January 15, 2025<br>) Time:  10:00 a.m.<br>) Courtroom:  1539<br>) Place 255 E. Temple Street<br>       Los Angeles, CA 90012 |

Pinterest, by and through counsel, hereby attaches Exhibit A. This is in support of docket no. 89, Pinterest's Opposition to Debtor's Motion Objecting to Certain Proofs of Claim; Declaration of Jessica McKinlay in Support.

Dated: December 30, 2024

Respectfully submitted

BIALSON, BERGEN & SCHWAB,
A Professional Corporation

By:  _/s/ Jessica McKinlay_
    Jessica McKinlay (Cal. Bar No. 282743)
Attorneys for Pinterest

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT A</u>**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| AMPLA, LLC | ) | |
| 1239 Broadway #1605 | ) | CASE NO. _____ |
| New York, NY 10001, | ) | |
| | ) | JUDGE _____ |
|      PLAINTIFF, | ) | |
| | ) | |
|   vs. | ) | **COMPLAINT** |
| | ) | |
| BURKE DECOR, LLC | ) | |
| c/o Jerry M. Bryan | ) | |
| Statutory Agent | ) | |
| 6 Federal Plaza Central, Suite 1300 | ) | |
| Youngstown, OH 44503, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ERIN BURKE | ) | |
| 6813 Commerce Dr. | ) | |
| Hubbard, OH 44425-2945, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AU MARCHE, LLC | ) | |
| c/o Erin Burke | ) | |
| Statutory Agent | ) | |
| 6813 Commerce Drive | ) | |
| Hubbard, OH 44425, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FURNISHINGS LA, LLC | ) | |
| c/o Christopher J. Newman, Esq. | ) | |
| Statutory Agent | ) | |
| 6 Federal Plaza Central, Suite 1300 | ) | |
| Youngstown, OH 44503, | ) | |
| | ) | |
| and | ) | |
| | ) | |

1

U.S. SMALL BUSINESS )
ADMINISTRATION )
2 North 20th Street, Suite 320 )
Birmingham, AL 35203, )
)
DEFENDANTS. )

## COMPLAINT

Plaintiff Ampla, LLC ("Ampla") for its Complaint against Defendants Burke Decor, LLC ("Burke Decor"), its principal and personal guarantor Ms. Erin Burke, Au Marche, LLC ("Au Marche"), Furnishings LA, LLC ("Furnishings," and collectively with Au Marche, the "Corporate Guarantors"), and U.S. Small Business Administration states as follows:

## INTRODUCTION

1.      In this lawsuit, Ampla seeks contractual and other remedies related to Burke Decor's breach of a Growth Line of Credit Agreement dated September 27, 2022 (the "Credit Agreement"), as accelerated and amended by a Forbearance and Corporate Guaranty Agreement dated October 19, 2023 (the "Forbearance Agreement," and together with the Credit Agreement, the "Growth LOC"), as well as fraudulent misrepresentations made in relation to the Growth LOC.[1]

2.      Under the Growth LOC, Ampla agreed to loan Burke Decor up to an initial credit limit of $8,217,028 for certain limited uses, in exchange for a right to collect a percentage of Burke Decor's receivables, a security interest in substantially all of Burke Decor's assets, a right to receive accurate financial reporting, and other contractual rights and remedies including the right to receivership.  Burke Decor defaulted under the Credit Agreement by, among other

---

[1] As set forth herein, Burke Decor defaulted under both the initial Credit Agreement and also defaulted under the Forbearance Agreement, all in breach of the Growth LOC comprised of the Credit Agreement and the Forbearance Agreement.  Ampla is entitled to all available remedies under the entirety of the Growth LOC.

2

things, transferring funds to unauthorized entities, using funds for unauthorized purposes, and
failing to report and deposit revenue, thus reducing Ampla's recovery of the percentage of
receivables due to it. Ampla worked out the Forbearance Agreement with Burke Decor, in
which Burke Decor and its guarantors admitted that Ampla was owed an accelerated balance of
$7,469,495 as of October 19, 2023. Burke Decor defaulted under the terms of the Forbearance
Agreement as well. Burke Decor currently owes Ampla in excess of $6.4 million, plus interest
accruing at the contractual rate.

3.      Additionally, Burke Decor and Erin Burke intentionally made material, written,
false representations about Burke Decor's financial condition during the life of the Growth LOC.
Ampla reasonably relied upon these misrepresentations to its detriment when it loaned additional
funds to Burke Decor that it would not have loaned if Burke Decor's true financial condition had
been disclosed and/or did not to pursue remedies available to it under the Growth LOC based on
Burke Decor's multiple breaches of contract. Burke Decor and Erin Burke caused the
misrepresentations to be made with intent to deceive.

4.      Ms. Erin Burke, the principal of Burke Decor, made a limited personal guaranty
for Burke Decor's payment obligations under the Growth LOC and is personally liable for the
full balance owed to Ampla, because the terms of her personal guaranty have been triggered.
Furnishings and Au Marche, the Corporate Guarantors, unconditionally guaranteed Burke
Decor's payment obligations under the Growth LOC and are also liable for the full balance owed
to Ampla.

5.      Burke Decor granted receivership rights to Ampla under the Growth LOC, which
have been triggered by these defaults and fraudulent conduct. Erin Burke and Burke Decor's
unauthorized uses of funds, depletion of corporate assets, and inaccurate financial reporting all

entitle Ampla to a receiver to preserve and/or sell the collateral securing the Growth LOC (*i.e.*, Burke Decor's assets).

**THE PARTIES**

6.       Plaintiff Ampla is a New York limited liability company, operating as a private lender entity serving the e-commerce and consumer brands industry. Its sole member is Ampla Technologies, Inc., a Delaware corporation with its principal place of business in New York City.

7.       Defendant Burke Decor is an Ohio limited liability corporation.  Upon information and belief, its principal place of business located in Boardman, Mahoning County, Ohio.  Its sole member is Erin Burke.  Burke Decor is in the business of marketing and selling high-end furniture and fixtures, chiefly online at www.burkedecor.com and at retail locations including one in Boardman, Ohio.

8.       Defendant Erin Burke ("Ms. Burke") is, upon information and belief, a resident of Ohio.  Ms. Burke maintains an Ohio driver's license (expiring August 2024) registered to a commercial building located at 6813 Commerce Dr., Hubbard, Ohio 44425-2945.  Ms. Burke is the President and sole member of Burke Decor, and is a limited personal guarantor of Burke Decor's payment obligations under the Growth LOC.

9.       Defendant Au Marche is an Ohio limited liability company. Upon information and belief, its sole member is Ms. Burke or Burke Decor. It is a secured corporate guarantor of Burke Decor's payment obligations under the Growth LOC.

10.       Defendant Furnishings is an Ohio limited liability company.  Upon information and belief, its sole member is Ms. Burke or Burke Decor. It is a secured corporate guarantor of Burke Decor's payment obligations under the Growth LOC.

4

11.     The U.S. Small Business Administration (the "SBA") may have an interest in the collateral that is the subject of this action pursuant to Financing Statement Nos. OH00262056346 and OH00239630476.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332.  The parties are of diverse citizenship and the amount in controversy exceeds $75,000.  Ampla's sole member is incorporated in Delaware and located in the State of New York.  Burke Decor, Ms. Burke, Au Marche, and Furnishings are not citizens of the States of New York or Delaware.  This is an action based on, among other things, a breach of the Growth LOC involving damages exceeding $6.3 million and fraudulent misrepresentations made in relation to the Growth LOC.

13.     Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because: a substantial part of the events underlying Plaintiff Ampla's claims occurred within Mahoning County, Ohio; the Collateral (defined below) is located or controlled within Mahoning County, Ohio; and Defendant Burke Decor's principal place of business is in Mahoning County, Ohio.  Moreover, as Ohio limited liability companies, Burke Decor, Au Marche, and Furnishings are all subject to service in the State of Ohio.  Mahoning County is located in the territorial jurisdiction of the Eastern Division of the Northern District of Ohio.

## FACTS

14.     Ampla is a private lender for the e-commerce and consumer packaged goods industry.  Ampla operates an all-in-one platform offering consolidated financial products to provide consumer-facing companies modern solutions to fuel growth and enhance efficiency.  Chief among Ampla's operating principles is a dedication to working tirelessly to ensure customer satisfaction, earning trust through honesty, and pushing toward future growth through data-driven innovation and decision making.  One of the distinctive features of Ampla's business model, for instance, is its willingness to be flexible in its repayment arrangements with its clients.  Rather than requiring fixed repayment amounts, Ampla works with its clients to fashion fluid repayment structures, which enable their clients to succeed in their business enterprises.  Since its inception in 2022, Ampla has raised more than $600 million in capital.  Ampla has received extensive praise from both its customers and within the financial services sector, being hailed for its "commitment to innovation and its track record [for] effectively serving consumer brands."[2]

15.     Defendant Burke Decor was formed by Erin Burke, its CEO and sole owner and member.  Burke Decor is engaged in the business of marketing and selling high-end furniture and home furnishings online. It has characterized itself as an online provider of "quality, high style design [of furniture] to people outside of metropolitan areas."[3]  Its annual sales in recent years exceeded $85 million.

---

[2] *City and Waterfall Asset Management Provide $275MM Credit Facility to Ampla*, ABF JOURNAL (Dec. 20, 2023), *available at* https://www.abfjournal.com/dailynews/citi-and-waterfall-asset-management-provide-275mm-credit-facility-to-ampla/ (last visited Mar. 22, 2024).

[3] *About Us*, BurkeDecor.com, *available at* https://www.burkedecor.com/pages/about-us (last visited Mar. 22, 2024).

## Growth Line of Credit Agreement

16.    In September 2022, Erin Burke on behalf of Burke Decor connected with Ampla

regarding funding to support Burke Decor's online furniture business.

17.    At the time Ms. Burke connected with Ampla, Burke Decor had already taken a

loan through the SBA in the approximate amount of $1 million (with approximately $500,000

advanced at the time the Growth LOC was underwritten).

18.    In seeking funding from Ampla, Erin Burke and Burke Decor made

representations regarding Burke Decor's business, financial circumstances (including the extent

of Burke Decor's sales), the value of its inventory, and other essential information.

19.    On or about September 27, 2022, reasonably relying on the information Ms.

Burke and Burke Decor provided, Ampla entered into the Credit Agreement with Burke Decor.

A copy of the Credit Agreement is attached as Exhibit 1. It provides, in relevant part, that Ampla

would provide Burke Decor with an initial credit limit of $8,217,028, and a maximum credit line

not to exceed $16 million, for the following limited uses only:

- Purchases of inventory, raw materials, packaging, or other specified goods;
- Manufacturing payments;
- Payments to shipping and/or fulfillment partners;
- Purchases of marketing and advertising services; and
- To the extent  not included above, other general administrative costs as determined by Lender [*i.e.*, Ampla] in its sole discretion.

(Credit Agreement, ¶¶6, 52).  Burke Decor agreed to these limitations and certified it would use

advanced funds for these enumerated purposes only.

20.    Burke Decor would obtain advances by submitting an online Advance Request,

which funds Ampla would advance by ACH credit or wire transfer to a Designated Checking

Account (defined in Credit Agreement ¶¶2, 7) if the request was approved.  Ampla retained the

right to reject an Advance Request (defined in Credit Agreement ¶¶2, 9), including upon the

occurrence of an Event of Default (defined in Credit Agreement ¶32).

21.     There was no fixed repayment amount due to Ampla under the Credit

Agreement.  Instead, in exchange for the funds advanced to Burke Decor, Ampla was entitled to

collect a percentage of Burke Decor's receivables to be determined based on the percentage of

available credit Burke Decor used: (A) for 0-20% credit utilization, Ampla was entitled to 8% of

Burke Decor's receivables; (B) for 21-40% credit utilization, Ampla was entitled to 16% of

Burke Decor's receivables; (C) for 41-60% credit utilization, Ampla was entitled to 24% of

Burke Decor's receivables; (D) for 61-80% credit utilization, Ampla was entitled to 32% of

Burke Decor's receivables; and (E) for 81-100% credit utilization, Ampla was entitled to 40% of

Burke Decor's receivables.  Ampla would use these rates to determine the amount to collect from

Burke Decor's receivables on a daily basis as they accrued (the "Collection Amount").  The

Collection Amount would be collected via ACH debits each business day.  This is how Ampla

was paid.

22.     To facilitate Ampla's debit of the Collection Amount and Burke Decor's

Obligations (defined in Credit Agreement ¶2) as holder of the receivables for Ampla's benefit,

Burke Decor was required to "cause all Receivables to be paid into [a] Designated Checking

Account" in Burke Decor's name and hosted at a banking institution of Ampla's choice.  Further,

Burke Decor agreed to collect all receivables promptly for deposit into that account, report all

receivables to Ampla, and enable Ampla to debit the Collection Amount from the Designated

Checking Account.  Until such time as the Collection Amount was withdrawn, Burke Decor was

required to hold its receivables in trust for Ampla.

23.     Burke Decor was prohibited from diverting any receivables away from the Designated Checking Account or denying Ampla access to that account, and all receivables held by payment processers or other third-parties in a transfer account were required to be deposited in the Designated Checking Account within 14 days of their receipt (subject to such processor's or other third-party's account-transfer rules).

24.     Additionally, Burke Decor was expressly prohibited from "putting a stop order or blocking any ACH or other remittance of Receivables to Borrower, or taking any action that results in a stop order or block."  (Credit Agreement, ¶23).

25.     The Credit Agreement also included a Limited Guaranty (defined in Credit Agreement, Signature Page) that Ms. Burke executed in which she agreed to be liable to Ampla "for losses and/or damages caused by [Burke Decor's] gross negligence, willful misconduct, misrepresentation or fraud."  (Credit Agreement, Signature Page).

26.     Further securing Ampla's right to payment, Burke Decor granted Ampla a security interest in the following collateral ("the Collateral"):

> (i) all Receivables including but not limited to any amounts owing to Borrower now or in the future; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

(Credit Agreement, ¶17). Ampla recorded its security interest via a UCC Financing Statement by First Corporate Solutions, Inc., as representative, on September 28, 2022, which recording is assigned FS No. OH00267040873, and on October 4, 2023, which recording is assigned as FS No. OH00276420678 in the records of the Ohio Secretary of State.

27.    In or around June 2023, Ampla discovered that Burke Decor had diverted money to entities affiliated with Burke Decor or Erin Burke that did not meet the enumerated uses under the Credit Agreement, were not disclosed as co-borrowers, and that Ampla had not approved. Specifically, Burke Decor was providing intercompany loans to unauthorized entities, which had grown from approximately $2 million in June 2022 (time the Growth LOC was underwritten) to $2.9 million as of December 2023. Additionally, from bank statement information provided to Ampla by Erin Burke and Burke Decor, Burke Decor made unauthorized transfers of:

- approximately $300,000 to Au Marche between June 2022 - June 2023;

- approximately $200,000 to 222 N. Brand Realty, LLC between June 2022 – June 2023 (approximately $250,000 from June 2022 – present);

- approximately $180,000 to 7373 Market St, LLC between June 2022 – June 2023 (approximately $250,000 from June 2022 – present);

- approximately $130,000 to Erin Burke between June 2022 – June 2023 (approximately $156,000 from June 2022 – present); and

- approximately $175,000 to an unknown entity for "SHELLPOINT MORTGAGE" between June 2022 – June 2023 (approximately $260,000 from June 2022 – present).

These payments included payroll, taxes, and mortgage payments for unauthorized entities.

10

28.     These transfers of funds were not authorized under the Credit Agreement, did not

satisfy the limited, enumerated uses for funds advanced under the Credit Agreement, and

breached the terms of it.

29.     Ampla also learned that Burke Decor deposited receivables in accounts other than

the Designated Checking Account. Beginning in July 2023, Burke Decor moved a majority of

revenue from its payment processor, Paymentech Solutions, away from Ampla and directly into

Burke Decor's own checking account. Even after Ampla pointed out this conduct to Burke

Decor, the latter continued to mask or divert receivables in breach of Burke Decor's Obligations.

For the period of April 1, 2023 to October 31, 2023, Burke Decor directly collected $29,200,000

in revenue. Using an average collection percentage of 40%, based on credit utilization, Burke

Decor should have remitted approximately $11,650,000 to Ampla in Collection Amounts to pay

down the Growth LOC.  During this time period, however, Burke Decor made wire payments

and permitted Collection Amounts from the Designated Checking Account together totaling only

about $6,300,000.  By keeping receivables out of the Designated Checking Account, Burke

Decor and Ms. Burke wrongly held onto approximately $5,350,000 which was owed to Ampla as

repayment.

30.     Because Ampla used the receivable deposits and its access to the Designated

Checking Account to determine the Collection Amount, and because Ampla debited the

Collection Amount via ACH transfers from the Designated Checking Account, Burke Decor's

diversion of receivables to other accounts interfered with and deprived Ampla of the ability to

calculate accurately and collect all sums due, the very essence of the Growth LOC mechanics.

31.     As signatories to the Credit Agreement, Erin Burke and Burke Decor knew that

the masking and diversion of receivables would result in an incomplete and inaccurate

11

determination as to the Collection Amount and would deprive Ampla of its full contractual payment and Ampla's ability to recover that payment.

32.     When Burke Decor failed to keep up with the wire payments it was making, Ampla sought to debit Burke Decor's Chase bank account ending in 0795 to recover sums due, as Ampla had done previously.  On or about August 17, 2023, Burke Decor blocked access to its Chase bank account (an ACH debit block), in breach of the Credit Agreement.  This precluded Ampla from receiving a payment in excess of $410,000 that was requested.

33.     Because of Burke Decor's actions breaching terms of the Credit Agreement, Ampla sent Burke Decor, attention Erin Burke, a Notice of Event of Default and Opportunity to Cure ("Notice") on August 17, 2023, identifying incidents of breach. The Notice allowed Burke Decor and Ms. Burke time to cure the event.  Neither Burke Decor nor Ms. Burke did so.  A copy of the Notice is attached as Exhibit 2.

34.     These multiple violations of Burke Decor's obligations under the Credit Agreement constituted independent defaults under Paragraph 32 of the Credit Agreement.

35.     Paragraph 33 of the Credit Agreement sets forth the parties' rights and remedies upon a default. It provides, among other remedies, that Ampla may: (1) "declare any and all Obligations immediately due and payable, without notice of any kind to [Burke Decor]"; (2) assemble and sell all of the Collateral; and (3) appoint a receiver to take possession over all of the Collateral, collect Burke Decor's revenues, and administer Burke Decor's accounts.

### The Forbearance Agreement

36.     On or about October 19, 2023, Ampla and Burke Decor entered into the Forbearance Agreement.  A copy of the Forbearance Agreement is attached as Exhibit 3.

37.    The Forbearance Agreement did not waive, eliminate, or replace any of the

obligations, rights, or remedies under the Credit Agreement.  It also did not cure the Events of

Default under the Credit Agreement.  The Forbearance Agreement set out the terms upon which

Ampla was willing to withhold enforcement of the rights and remedies under the Credit

Agreement so long as Burke Decor remained in compliance with such terms. It also further

secured Ampla through the addition of the two Secured Corporate Guarantors, and additional

rights to enforce certain structured payments of an accelerated balance.

38.    In the Forbearance Agreement, Defendants agreed and admitted that:

> Pursuant to the Credit Agreement, Section 33(C), Lender asserts it can accelerate
> the balance of Obligations, which as of today's date is $7,469,495.00, plus
> hereinafter accruing contractual interest ("Balance").  Lender asserts that the
> Balance is now due and owing, in full.  Borrower admits that the Balance is now
> due and owing, in full, to Lender.

(Forbearance Agreement, p.1).  This provision and unequivocal admission by Burke

Decor (and Erin Burke as signatory) of default constituted an acceleration of Burke

Decor's payment obligations under the Credit Agreement.

39.    Defendants Au Marche and Furnishings also joined in the Forbearance Agreement

as corporate guarantors of all of Burke Decor's Obligations under the Growth LOC:

> The guarantors signing below are affiliate companies of the Borrower ("Secured
> Corporate Guarantors"). Secured Corporate Guarantors each, joint and several to
> each other and the Borrower, absolutely and unconditionally guarantee the prompt
> payment to Lender, including its successors and assignees, of any and all
> Obligations incurred by the Borrower pursuant to the Credit Agreement, which as
> of today's date, includes but is not limited to a running Balance of Obligations of
> $7,469,495.00 (this "Secured Corporate Guaranty"). . . . Furthermore, and not
> limiting the foregoing in any respect, Secured Corporate Guarantors each consent
> to, agree to be bound by, and otherwise join into each and every of the following
> provisions from the Credit Agreement in the same capacity as, and thus alongside
> and joint and several to Borrower, which provisions for the avoidance of any
> doubt are hereby incorporated by reference: Sections 17, 18, 19, 20, 22, 23, 25,
> 26, 28, 29, 32, 33, 34, 35, 36, 39, 45, 46, 47, 48, 50 and 52.

(Forbearance Agreement, ¶5) (emphasis in original).

40.    The Secured Corporate Guarantors granted Ampla a security interest in "all assets, personal property" of theirs, coextensive with the scope of Collateral defined in Paragraph 17 of the Credit Agreement (the "Guarantor Collateral").

41.    The Forbearance Agreement further provided that effective immediately, Burke Decor was required to follow a detailed payment plan to reduce the amount of money Burke Decor owed Ampla:

> Commencing Thursday, October 19, 2023, and repeating every Thursday thereafter, and should a Thursday be a non-banking day, then the very next day (Friday), Borrower shall wire transfer to the Lender Wire Account (as defined below) the following payments: (i) for weeks 1 through 14 inclusive (commencing Thursday, October 19, 2023, and ending Thursday, January 18, 2024), $25,000 shall be wire transferred by Borrower to Lender each and every Thursday; (ii) for weeks 15 through 20 inclusive (commencing Thursday, January 25, 2024, and ending Thursday, February 29, 2024), $150,000 shall be wire transferred by Borrower to Lender each and every Thursday; and (iii) for weeks 21 through 25 inclusive (thus commencing Thursday, March 7, 2024, and ending Thursday, April 4, 2024), $250,000 shall be wire transferred by Borrower to Lender each and every Thursday (collectively, the "Weekly Payments").

(Forbearance Agreement, ¶1) (emphasis in original).

42.    Burke Decor was also required to make a lump-sum payment of "the greater of: (i) all of Burke Decor's cash in excess of $2,000,000, or (ii) $250,000" on January 2, 2024 (Forbearance Agreement, ¶3), along with an accounting of how the amount was determined (the "Excess Cash Bullet Payment," and together with the Weekly Payments, the "Forbearance Payments").

43.    Burke Decor made some but not all of the Weekly Payments through December 2023.  But on January 2, 2024, Burke Decor committed its first major default under the Forbearance Agreement by failing to make the Excess Cash Bullet Payment.

14

44.    In addition, Burke Decor failed to make the full increased (from $25,000 per week to $150,000 per week) Weekly Payments for January 25, 2024 and after.  Below is a summary of Burke Decor's payments against the amounts owed under the Forbearance Agreement:

| Beginning of period | End of period | Owed, per forbearance agreement | Aggregate owed, per forbearance agreement | Ampla collections | Aggregate Ampla collections | Difference in aggregate Ampla collections vs. owed |
|---|---|---|---|---|---|---|
| 13-Oct-23 | 19-Oct-23 | $25,000.00 | $25,000.00 | $3,827.06 | $3,827.06 | ($21,172.94) |
| 20-Oct-23 | 26-Oct-23 | $25,000.00 | $50,000.00 | $39,480.02 | $43,307.08 | ($6,692.92) |
| 27-Oct-23 | 02-Nov-23 | $25,000.00 | $75,000.00 | $26,940.01 | $70,247.09 | ($4,752.91) |
| 03-Nov-23 | 09-Nov-23 | $25,000.00 | $100,000.00 | $27,542.87 | $97,789.96 | ($2,210.04) |
| 10-Nov-23 | 16-Nov-23 | $1,025,000.00 | $1,125,000.00 | $607,974.12 | $705,764.08 | ($419,235.92) |
| 17-Nov-23 | 23-Nov-23 | $25,000.00 | $1,150,000.00 | $139,093.00 | $844,857.08 | ($305,142.92) |
| 24-Nov-23 | 30-Nov-23 | $25,000.00 | $1,175,000.00 | $342,897.44 | $1,187,754.52 | $12,754.52 |
| 01-Dec-23 | 07-Dec-23 | $25,000.00 | $1,200,000.00 | $19,031.34 | $1,206,785.86 | $6,785.86 |
| 08-Dec-23 | 14-Dec-23 | $25,000.00 | $1,225,000.00 | $40,764.28 | $1,247,550.14 | $22,550.14 |
| 15-Dec-23 | 21-Dec-23 | $25,000.00 | $1,250,000.00 | $29,416.42 | $1,276,966.56 | $26,966.56 |
| 22-Dec-23 | 28-Dec-23 | $25,000.00 | $1,275,000.00 | $28,953.03 | $1,305,919.59 | $30,919.59 |
| 29-Dec-23 | 04-Jan-24 | $275,000.00 | $1,550,000.00 | $19,631.32 | $1,325,550.91 | ($224,449.09) |
| 05-Jan-24 | 11-Jan-24 | $25,000.00 | $1,575,000.00 | $30,027.43 | $1,355,578.34 | ($219,421.66) |
| 12-Jan-24 | 18-Jan-24 | $25,000.00 | $1,600,000.00 | $60,442.10 | $1,416,020.44 | ($183,979.56) |
| 19-Jan-24 | 25-Jan-24 | $150,000.00 | $1,750,000.00 | $25,457.94 | $1,441,478.38 | ($308,521.62) |
| 26-Jan-24 | 01-Feb-24 | $150,000.00 | $1,900,000.00 | $34,169.24 | $1,475,647.62 | ($424,352.38) |
| 02-Feb-24 | 08-Feb-24 | $150,000.00 | $2,050,000.00 | $12,044.36 | $1,487,691.98 | ($562,308.02) |
| 09-Feb-24 | 15-Feb-24 | $150,000.00 | $2,200,000.00 | $6,142.66 | $1,493,834.64 | ($706,165.36) |
| 16-Feb-24 | 22-Feb-24 | $150,000.00 | $2,350,000.00 | $9,318.17 | $1,503,152.81 | ($846,847.19) |
| 23-Feb-24 | 29-Feb-24 | $150,000.00 | $2,500,000.00 | $10,761.99 | $1,513,914.80 | ($986,085.20) |
| 01-Mar-24 | 07-Mar-24 | $250,000.00 | $2,750,000.00 | $8,589.37 | $1,522,504.17 | ($1,227,495.83) |
| 08-Mar-24 | 14-Mar-24 | $250,000.00 | $3,000,000.00 | $11,781.52 | $1,534,285.69 | ($1,465,714.31) |
| 15-Mar-24 | 21-Mar-24 | $250,000.00 | $3,250,000.00 | $15,314.15 | $1,549,599.84 | ($1,700,400.16) |
| 22-Mar-24 | 28-Mar-24 | $250,000.00 | $3,500,000.00 | $11,597.42 | $1,561,197.26 | ($1,938,802.74) |
| 29-Mar-24 | 04-Apr-24 | $250,000.00 | $3,750,000.00 | -- | $1,561,197.26 | ($2,188,802.74) |
| 05-Apr-24 | 11-Apr-24 | Remainder | Remainder | -- | $1,561,197.26 | Remainder + Above |

45.    Moreover, the Forbearance Agreement required Burke Decor to make payment in full of all outstanding obligations, including but not limited to the principal balance on the Growth LOC plus all interest, by April 11, 2024.  This amount exceeded $6.3 million as of April 11, 2024.  Ampla reminded Burke Decor of this deadline in advance.  Burke Decor failed to make the April 11, 2024 payment in full.  Burke Decor did not offer any justification for its failure to pay.

46.    As a result, Defendants are in default of the Forbearance Agreement.  Ampla provided to Burke Decor and Ms. Burke a Notice of Default of the Forbearance Agreement, which is attached as Exhibit 4.  Ampla may proceed to enforce the terms of the Growth LOC and all remedies provided thereunder.

### Other Misrepresentations and Mismanagement

47.    In addition to the foregoing breaches, concealed receivables, and other misconduct, financials Burke Decor submitted to Ampla throughout FY2023 fraudulently misrepresented in a material way Burke Decor's actual financial condition.

48.    These misrepresentations throughout 2023 became apparent in 2024.

49.    A January 15, 2024, email from Ms. Burke revealed that Burke Decor had submitted financials to Ampla that omitted approximately $1.5 million in accounts payable balances.

50.    Beginning in February 2024, Glencoe Capital (Burke Decor's accounting advisor) disclosed documents to Ampla related to the Growth LOC; these documents showed that Burke Decor's previous reporting substantially misrepresented its unfavorable financial condition.

51.    Glencoe Capital disclosed a preliminary Profit & Loss statement and Balance sheet dated February 29, 2024, showing a $3.579 million write down from Burke Decor's previous inventory positions.

52.    Burke Decor's actual inventory balances were 57% *lower* than Burke Decor had been reporting to Ampla.

53.    The inaccuracy of Burke Decor's earlier inventory reporting was further highlighted by a January 4, 2024 Balance Sheet for Burke Decor submitted to Ampla by Glencoe Capital, showing that Burke Decor's inventory position, an essential metric in assessing its compliance with the Growth LOC, had not been updated in June through August 2023.

54.    Additionally, the February 29, 2024 preliminary Profit & Loss statement and Balance sheet from Glencoe Capital showed a $3.178 million *increase* to accounts payable from

previously reported positions.  Burke Decor's actual accounts payable balances were 142% higher than it had reported.

55.     Ampla was harmed by these misrepresentations because it reasonably relied on these written financial statements and continued to extend credit to Burke Decor on the basis of inaccurate financial information.

56.     Credit Agreement ¶ 8, among other relevant language, provides that Ampla "may in its sole and absolute discretion make an advance to [Burke Decor] under the Line of Credit following its receipt of an Advance Request."  Credit Agreement ¶ 10 permits Ampla to deny an Advance Request upon an Event of Default, which includes failure to faithfully provide reports and other information (Credit Agreement ¶ 33(ii)).  Credit Agreement ¶ 10 also permits Ampla to deny an Advance Request upon a breach of Burke Decor's representations and warranties, which includes the warranty that "all books and records of Borrower are accurate and up to date and will be so maintained" (Credit Agreement ¶ 22(vii)).

57.     Nonetheless, Ampla continued to loan additional funds to Burke Decor into August 2023, based upon Burke Decor's false financial records that mislead Ampla as to both Burke Decor's financial condition and compliance with reporting requirements under the Growth LOC.

58.     Moreover, Ampla was harmed by its reasonable reliance when it forwent available actions to pursue remedies available to it based on Burke Decor's contractual breaches. Ampla could have taken different actions to secure the amount owed to it had it known that Burke Decor and Ms. Burke were submitting false financial records or had it known that Burke Decor's condition was worse than represented.

## COUNT I
### Breach of Contract – Burke Decor

59.    Ampla incorporates by reference the foregoing allegations.

60.    The Growth LOC constitutes a valid and enforceable contract: the Credit
Agreement and Forbearance Agreement are in writing and signed by Burke Decor through Ms.
Burke in her capacity as its President and sole member, and the mutual obligations and rights
arising under the Credit Agreement and Forbearance Agreement are good and valuable
consideration supporting the bargain therein.

61.    Ampla performed its obligations under the Growth LOC by, among other things:
(1) advancing funds pursuant to Burke Decor's Advance Requests; (2) providing Notice of
Default under the Credit Agreement and Forbearance Agreement to Burke Decor, Erin Burke,
Au Marche, and Furnishings; and (3) providing Burke Decor, Erin Burke, Au Marche, and
Furnishings an opportunity to cure the Events of Default.

62.    As set forth herein, Burke Decor breached the Growth LOC by, among other
things: (1) failing to fulfill its obligations with respect to the deposit of all receivables in the
Designated Checking Account; (2) failing to accurately and fully report its receivables and other
financial information to Ampla; (3) diverting receivables to accounts other than to the
Designated Checking Account; (4) failing to deposit promptly all receivables into the Designated
Checking Account; (5) using receivables (prior to Ampla's receipt of the related Collection
Amount) and advanced funds for purposes other than those permitted under the Credit
Agreement and Forbearance Agreement, including transferring funds to unauthorized entities;
(6) blocking or stopping ACH transfers of payments from sales; (7) blocking or stopping ACH
transfers from the Designated Checking Account to Ampla; (8) failing to make all of the
Forbearance Payments; and (9) submitting false financial records to Ampla.

63.     As a result of Burke Decor's multiple breaches of the Growth LOC, Ampla has

been damaged in an amount in excess of $6.4 million (inclusive of principal and currently-

accrued interest), plus interest continuing to accrue at the contractual rate, plus all costs and

expenses incurred (the "Outstanding Balance").

64.     As a result of these breaches, Ampla is entitled to, among other remedies

provided in the Growth LOC: (1) compensatory damages in an amount equal to the Outstanding

Balance; (2) appointment of a receiver to assemble, possess, and dispose of the Collateral, and

exercise all rights and powers provided under Paragraph 33 of the Credit Agreement; (3) costs

and reasonable attorneys' fees incurred in enforcing the Growth LOC (*see* Credit Agreement,

¶26); and (4) any other relief which this Court deems just and proper.

### COUNT II
### Breach of Limited Guaranty – Erin Burke

65.     Ampla incorporates by reference the foregoing allegations.

66.     In signing the Growth LOC as a Limited Guarantor of Burke Decor's Obligations,

Erin Burke agreed as follows:

> The guarantor signing below is an owner or partial owner of the Borrower
> ("Limited Guarantor"). The Limited Guarantor understands and agrees that he or
> she, in his or her individual and personal capacity, shall be liable, but only liable,
> for losses and/or damages caused by Borrower's gross negligence, willful
> misconduct, misrepresentation or fraud. Such Limited Guarantor will benefit by the
> transactions contemplated under this Agreement, and Lender executes this
> Agreement based on such Limited Guarantor agreeing to this Limited Guaranty.

(Credit Agreement, Signature Page).

67.     The Limited Guaranty in the Growth LOC is a valid and enforceable contract: it is

in writing, signed by Ms. Burke, and supported by valuable consideration.  Specifically—as

stated in the Limited Guaranty—Ms. Burke personally benefited from the Growth LOC because

she was the President and sole member of Burke Decor, with an interest in its growth and

financial condition.

68.    Ms. Burke and Burke Decor made written financial misrepresentations to Ampla,

knowing they were substantially inaccurate, with the intention that Ampla would rely upon them.

Ms. Burke and Burke Decor also concealed receivables from Ampla.  These actions constituted

misrepresentations and fraud as detailed herein, triggering Erin Burke's personal guarantee under

the Growth LOC.

69.    Ms. Burke and Burke Decor also engaged in willful misconduct or gross

negligence, which interfered with Ampla's rights under the Growth LOC, including among other

things: (1) diverting receivables to accounts other than the Designated Checking Account and

otherwise concealing receivables, despite knowing that such diversion would interfere with

Ampla's ability to determine and realize the Collection Amount; (2) using receivables to fund

business operations rather than service debt obligations prior to Ampla's receipt of the related

Collection Amount; (3) using advanced funds for purposes other than those permitted under the

Credit Agreement and Forbearance Agreement; (4) failing to hold the receivables in trust for

Ampla; (5) making distributions to Erin Burke—and non-authorized entities that she owns—

from receivables prior to Ampla's receipt of the Collection Amount and/or from the advanced

funds; (6) initiating an ACH debit block on Ampla in an intentional effort to block Ampla from

collecting repayment; and (7) submitting false financial records to Ampla.  At all times, Ms.

Burke and Burke Decor intended, knew, or should have known that these actions would deprive

Ampla of its contractual rights and repayment.  These actions exceeded a breach of the Growth

LOC terms and constituted a deliberate attempt to conceal assets from Ampla, misrepresent

Burke Decor's financial condition, and deny Ampla's ability to receive sums due under the

Growth LOC structure. This willful misconduct and gross negligence also triggered Erin Burke's personal guarantee.

70.     Burke Decor's and Ms. Burke's misrepresentations, willful misconduct, gross negligence, and fraud were a direct and proximate cause of the Events of Default under the Growth LOC.

71.     As a result of Burke Decor's and Ms. Burke's misrepresentations, willful misconduct, gross negligence, and fraud, the Limited Guaranty is triggered and Ms. Burke is personally liable for the Outstanding Balance as provided under the Growth LOC.

72.     Ampla has notified Ms. Burke of the Events of Default under the Growth LOC and demanded payment in full of all obligations due and payable to Ampla under the Limited Guaranty, which payment Ms. Burke has not made.

73.     Ms. Burke's failure to make all payments due and owing to Ampla under the Limited Guaranty constitutes a breach of the Limited Guaranty.

74.     As a result of Ms. Burke's breach of the Limited Guaranty, Ampla has been damaged in an amount equal to the Outstanding Balance.

75.     Ampla is entitled to an award of compensatory damages against Ms. Burke in an amount equal to the Outstanding Balance. In addition to the Outstanding Balance, Ampla is entitled to an award of all costs and reasonable attorneys' fees incurred in enforcing the Growth LOC and the Limited Guaranty.

## COUNT III
### Breach of Guaranty – Au Marche and Furnishings

76.     Ampla incorporates by reference the foregoing allegations.

77.     The Secured Corporate Guaranty is a valid and enforceable contract: it is in writing and signed on behalf of Au Marche and Furnishings by Ms. Burke as their member.

78.     The exchange of promises in the Forbearance Agreement was good and valuable consideration for the Secured Corporate Guaranty, especially because Au Marche and Furnishings had an interest in the financial condition of Burke Decor and the contemplated forbearance as affiliated entities operating in a support capacity to Burke Decor.  Specifically, Ms. Burke had represented to Ampla that Au Marche operated as Burke Decor's payroll company for its California operations, and Furnishings was a retail store for Burke Decor's California operations.

79.     As set forth herein, Events of Default have occurred under the Growth LOC, thereby triggering Au Marche's and Furnishings' obligations under the Secured Corporate Guaranty.

80.     Ampla has demanded payment in full of all Obligations due and payable to Ampla, which payment has not been made.

81.     Au Marche's and Furnishings' failure to make all payments due and owing to Ampla under the Secured Corporate Guaranty constitutes a breach of the Secured Corporate Guaranty.

82.     As a result of Au Marche's and Furnishings' breach of the Secured Corporate Guaranty, Ampla has been damaged in an amount equal to the Outstanding Balance.

83.     Ampla is entitled to an award of compensatory damages against Au Marche and Furnishings, jointly and severally, in an amount equal to the Outstanding Balance.  In addition to the Outstanding Balance, Ampla is entitled to an award of all costs and reasonable attorneys' fees incurred in enforcing the Growth LOC and the Corporate Guaranty.

## COUNT IV
### Appointment of a Receiver

84.    Ampla incorporates by reference the foregoing allegations.

85.    The Credit Agreement provides as one of the remedies available to Ampla at any time following an Event of Default the appointment of a receiver.  The Credit Agreement provides, in relevant part, that the appointed receiver shall have the right to "to take possession of all or any part of the Collateral, with the power to protect and preserve . . . operate . . . collect the payments, rents, income, and revenues from . . . [and] apply it to payment of [Burke Decor's] Obligations.  (Credit Agreement, ¶33(F).)  Further, the receiver has the power to: (1) sell the collateral; (2) receive and open Burke Decor's mail; (3) change Burke Decor's mailing address; (4) endorse notes, checks, drafts, money orders, titles, instruments, payments, and shipments on behalf of Burke Decor; and (5) direct Burke Decor's account debtors to make payments directly to Ampla.  (Credit Agreement, ¶33(E), (G)).

86.    As set forth herein, multiple Events of Default have occurred, thereby triggering Ampla's contractual right to the appointment of a receiver.

87.    In addition to this contractual remedy, a receiver is appropriate to preserve, protect, and/or sell Burke Decor's assets, to operate Burke Decor, as well as to collect rents and revenues received by Burke Decor.

88.    As set forth herein, Defendants have transferred receivables and loaned amounts to unauthorized entities and for purposes not permitted under the Growth LOC.  They have over-reported inventory and under-reported accounts payable, creating a dramatically false picture of financial health.  Defendants have moved receivables into accounts other than the Designated Checking Account, so that Ampla could not calculate or collect the sums due to it from that account as set forth in the Growth LOC.

23

89.    In addition, Ms. Burke has made recent representations to Ampla suggesting that Burke Decor is illiquid, may become insolvent, and is unable to operate while also satisfying its outstanding obligations to Ampla and other creditors.  Buke Decor has informed Ampla that it does not have sufficient access to its cash collected from revenues, and has disclosed that it has only $15,000 in operating cash as of April 1, 2024.  A March 31, 2024 Daily Dashboard provided to Ampla by Burke Decor shows that Burke Decor had negative liquidity for twenty-four days out of the month of March 2024, with a low point of *negative* $27,205.

90.    Further, Burke Decor has been placed on a MATCH List by its payment processor Shopify.  This designation signals that Burke Decor has excessive chargebacks and is a high-risk account for payment processors.  As a result of this designation, Burke Decor's payment processors are holding high cash reserves, which have further deprived Burke Decor of access to sufficient operating capital to meet its obligations.

91.    Burke Decor is also facing issues with Intuit and Paypal, who are also holding high cash reserves.  Ampla has learned that Burke Decor has collected funds from customers (on pre-payment), but has not fulfilled related orders.  The value of Burke Decor's outstanding customer obligations is unknown at this time, but upon information and belief, is estimated to be in the millions of dollars.

92.    Burke Decor's President, Erin Burke, is struggling to resolve the payment processor issues, loan defaults, and business operations.  She has hired two different restructuring officers simultaneously, has engaged investment banks, and has attempted potential sales of the business.  None of these actions has meaningfully improved the business or financial condition of Burke Decor.  In light of these additional expenditures and continued operational failures, Ampla believes that there is a substantial likelihood that Burke Decor will continue to

deplete its resources—thereby diminishing and devaluing Ampla's Collateral and, in the end, preventing Ampla from recovering all money due it.

93.    Appointment of a receiver would provide greater oversight over Burke Decor's operations and financial decisions, thereby providing greater security over the Collateral. Further, as an objective third party, the receiver will have the ability to administer the operations and assets of Burke Decor impartially, and negotiate resolutions to other ongoing business difficulties that Burke Decor is facing.

### COUNT V
### Fraud – Burke Decor and Erin Burke

94.    Ampla incorporates by reference the foregoing allegations.

95.    Burke Decor and Erin Burke made material misrepresentations of fact in writing to Ampla when they misrepresented Burke Decor's financials, specifically inventory and accounts payable amounts that were inaccurately reported as of June 2023 or earlier and continued to be inaccurately reported into 2024.  As set forth herein, Burke Decor's actual inventory balances were 57% *lower* than Burke Decor and Ms. Burke had reported to Ampla, and Burke Decor's actual accounts payable balances were 142% *higher* than Burke Decor and Ms. Burke had reported to Ampla.

96.    Burke Decor and Erin Burke would have had knowledge of the falsity of these records based on their daily operations of their business.

97.    Burke Decor and Erin Burke submitted the false records with the intent of inducing reliance by Ampla, specifically that Ampla would continue to extend additional loan amounts.

98.    Ampla was entitled to rely on Burke Decor and Erin Burke's financial records, and Ampla did so reasonably and justifiably.  Ampla extended additional loan amounts into

August 2023 based upon Burke Decor's misrepresentations about its financial condition and

compliance with reporting requirements under the Growth LOC.  Further, based on Ampla's

reasonable reliance on Erin Burke and Burke Decor's knowing and intentional

misrepresentations, Ampla did not take steps at that time to pursue remedies available to it under

the Growth LOC.  Absent accurate disclosures from Burke Decor, Ampla did not have the means

to determine the true nature of the information by exercising ordinary diligence.

99.    Burke Decor and Erin Burke's conduct has proximately harmed Ampla in the

amount of additional credit extended on the basis of Burke Decor and Erin Burke's fraudulent

misrepresentations.  Additionally, Ampla has been proximately harmed in the amount of the

entire Outstanding Amount, because, based on Ampla's reasonable reliance on Erin Burke and

Burke Decor's knowing and intentional misrepresentations, Ampla did not take steps at that time

to pursue remedies available to it under the Growth LOC.

100.    Ampla is entitled to an award of compensatory and punitive damages against

Burke Decor and Erin Burke.

### COUNT VI
### Fraudulent Concealment – Burke Decor and Erin Burke

101.    Ampla incorporates by reference the foregoing allegations.

102.    Burke Decor and Erin Burke had a duty to disclose material facts, specifically

Burke Decor's accurate financials as to inventory and accounts payable amounts that were

falsely reported as of June 2023 or earlier and continued to be falsely reported until 2024.  As set

forth herein, Burke Decor's actual inventory balances were 57% *lower* than Burke Decor and

Ms. Burke had reported to Ampla, and Burke Decor's actual accounts payable balances were

142% *higher* than Burke Decor and Ms. Burke had reported to Ampla.  The maintenance and

submission of false financial records was a violation of the representations and warranties under the Growth LOC.

103.    Additionally, Burke Decor and Erin Burke had a duty to disclose and make available to Ampla for collection Burke Decor's receivables.  Instead, as described herein, Burke Decor and Erin Burke diverted receivables, concealing those receivables from Ampla, and preventing Ampla from collecting receivable due to it under the Growth LOC.

104.    Burke Decor and Erin Burke had knowledge of Burke Decor's actual and accurate financial records and receivables based on their daily operations of their business, and thus knew the true data they were bound to disclose to Ampla.

105.    Nonetheless, Burke Decor and Erin Burke failed to discharge their duties to disclose.  Rather than report accurate inventory, accounts payable, receivables, and other financials, they provided Ampla with inaccurate financials that concealed Burke Decor's true condition by over-representing inventory, under-representing accounts payable, and concealing receivables.  Burke Decor and Erin Burke did not correct the inaccuracies.

106.    Burke Decor and Erin Burke knowingly concealed Burke Decor's accurate financial condition and receivables with the intent of inducing reliance by Ampla, specifically that Ampla would continue to extend additional loan amounts and would not collect the full amount of receivables owed to it.

107.    Ampla was entitled to rely on Burke Decor and Erin Burke's financial records and reported receivables, and Ampla did so reasonably and justifiably.  Ampla extended additional loan amounts into August 2023 based the concealment of Burke Decor's actual financial condition and failure to comply with reporting requirements under the Growth LOC.  Ampla collected less receivables than it was owed based upon the concealment of Burke Decor's actual

27

receivables.  Further, based on Ampla's reasonable reliance on Erin Burke and Burke Decor's

knowing and intentional concealment, Ampla did not take steps at that time to pursue remedies

available to it under the Growth LOC.  Absent accurate disclosures from Burke Decor, Ampla

did not have the means to determine the true nature of the information by exercising ordinary

diligence.

108.     Burke Decor and Erin Burke's conduct has proximately harmed Ampla in the

amount of additional credit extended on the basis of Burke Decor and Erin Burke's fraudulent

concealment.  Additionally, Ampla has been proximately harmed in the amount of the additional

receivables it would have collected had Burke Decor and Erin Burke not diverted and concealed

those receivables.  Additionally, Ampla has been proximately harmed in the amount of the entire

Outstanding Amount, because, based on Ampla's reasonable reliance on Erin Burke and Burke

Decor's knowing and intentional concealment, Ampla did not take steps at that time to pursue

remedies available to it under the Growth LOC.

109.     Ampla is entitled to an award of compensatory and punitive damages against

Burke Decor and Erin Burke.

**COUNT VII**
**Aiding and Abetting – Erin Burke**

110.     Ampla incorporates by reference the foregoing allegations.

111.     To the extent that it is determined that only Burke Decor fraudulently misstated or

concealed material facts, Erin Burke aided and abetted the fraud.

112.     As alleged herein, the maintenance of false financial records, the submission of

those records to Ampla, and the concealment of material financial information from Ampla

constitute multiple underlying frauds.

113.     By virtue of her role as principle of Burke Decor, her daily operation of the

business, and her interaction with Ampla, Erin Burke had knowledge of the frauds.

114.     Erin Burke provided substantial assistance in achieving the frauds by maintaining

and submitting the false financials, helping to conceal Burke Decor's actual financial condition

and receivables, otherwise enabling the fraud, and/or failing to act when required to do so.

115.     Her actions proximately caused the harm to Ampla set forth in its fraudulent

misrepresentation and fraudulent concealment claims herein.

116.     Ampla is entitled to an award of compensatory and punitive damages against Erin

Burke.

## COUNT VIII
### Costs and Reasonable Attorney Fees

117.     Ampla incorporates by reference the foregoing allegations.

118.     The Credit Agreement provides at Paragraph 26 that if Burke Decor defaults on

its obligations, Ampla is entitled to recover:

> any and all expenses, including, but not limited to, collection costs, all attorneys'
> fees and expenses, and all other expenses of like or unlike nature which may be
> expended by Lender to obtain or enforce payment of Obligations either as against
> Borrower or in the prosecution or defense of any action or concerning any matter
> arising out of or connected with the subject matter of this Agreement, the
> Obligations, or any of Lender's rights or interests therein or thereto . . .

(Credit Agreement, ¶26).  Further, because Ms. Burke's, Au Marche's, and Furnishings' liability

under the respective guaranties are triggered as described above, Ampla is entitled to recover

these costs and attorneys' fees against all four of these Defendants, jointly and severally.

119.     At the conclusion of this lawsuit, Ampla will submit to the Court for *in camera*

review an accounting of all costs and attorneys' fees sought herein.

**COUNT IX**
**Sale of Collateral**

120.     Ampla incorporates by reference the foregoing allegations.

121.     In order to secure the obligations of Burke Decor, Burke Decor – through the Growth LOC – pledged the Collateral to Ampla.

122.     Because of Burke Decor's defaults, as set forth herein, and pursuant to the terms of the Growth LOC, Ampla is entitled to foreclose and sell the Collateral described herein at public or private sale in accordance with the lien priority of all parties with an interest in the Collateral.

123.     The SBA may have interest in the Collateral, by virtue of filed UCC-1 financing statements.

**COUNT X**
**Accounting**

124.     Ampla incorporates by reference the foregoing allegations.

125.     Ampla lent money to Burke Decor pursuant to the Growth LOC, and had a right to collect a percentage of all of Burke Decor's receivables as payment.

126.     Burke Decor failed to deposit all of its receivables into the Designated Checking Account to facilitate Ampla's calculation and realization of the Collection Amount.

127.     Absent an accounting from Burke Decor, the actual value of receivables subject to collection cannot be determined and, as a result, the amount due and owing to Ampla cannot be determined with accuracy.

128.     Ampla is entitled to an accounting of all of Burke Decor's receivables from the outset of the Growth LOC through the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ampla, LLC requests the Court to enter the following relief:

A.      On Count I, judgment in favor of Ampla and against Burke Decor for breach of contract, and an award of compensatory damages in an amount equal to the Outstanding Balance;

B.      On Count II, judgment in favor of Ampla and against Ms. Burke for breach of the Limited Guaranty, and an award of compensatory damages in an amount equal to the Outstanding Balance;

C.      On Count III, judgment in favor of Ampla and against Au Marche and Furnishings for breach of the Secured Corporate Guaranty, and an award of compensatory damages in an amount equal to the Outstanding Balance;

D.      On Count IV, that a receiver be appointed to take possession of, preserve, and operate Burke Decor, and exercise all powers contemplated in the Growth LOC and all powers granted within the equitable powers of this Court;

E.      On Counts V, VI, and VII judgment in favor of Ampla and against Burke Decor and Erin Burke for fraudulent misrepresentations and/or fraudulent concealment, and an award of compensatory and punitive damages;

F.      On Count VIII, that Ampla be awarded all reasonable attorneys' fees and costs in enforcing its rights under the Growth LOC;

G.      On Count IX, that Ampla be found to have a good and valid lien in the Collateral, and that the Collateral be sold at a public or private sale;

H.      On Count X, that Ampla be found entitled to an accounting of all of Burke Decor's receivables from the outset of the Growth LOC through Present;

31

I.      An award of Ampla's reasonable attorneys' fees and costs; and

J.      Such other and further relief that is fair and equitable.


Respectfully submitted,


/s/ *David P. Shouvlin*

DAVID P. SHOUVLIN (0066154)
PORTER WRIGHT MORRIS & ARTHUR LLP
41 S. High Street, Suite 3100
Columbus, OH 43215-6194
Phone: (614) 227-1980
Fax: (614) 227-2100
dshouvlin@porterwright.com

McDANIEL M. KELLY (0097628)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH 44113
Phone: (216) 443-9000
Fax: (216) 443-9011
mkelly@porterwright.com

*Attorneys for Plaintiff, Ampla LLC*

24127935

**Ampla**

# SUPPLEMENT TO
# GROWTH LINE OF CREDIT AGREEMENT

| Term | Amount | Simple Explanation |
|---|---|---|
| **Maximum Line Size** | **$16,000,000** | As your business grows, you can draw up to this amount.<br><br>(See the Agreement for more detail) |
| **Credit Limit** | **$8,217,028** | The amount you can draw today.<br><br>(See the Agreement for more detail) |

**Credit Limit calculation**

| Metric | Amount | Advance Rate | Limit |
|---|---|---|---|
| Monthly Cashflows | $6,847,523 | 120% | $8,217,028 |
| Total | | | $8,217,027 |

This is how your Credit Limit is calculated. This limit is based on business performance as your business metrics update.

(See the Agreement for more detail)

**Collection Percentage Grid**

| Credit Limit Utilization | Collection Percentage |
|---|---|
| 81-100% | 40% |
| 61-80% | 32% |
| 41-60% | 24% |
| 21-40% | 16% |
| 0-20% | 8% |

We collect a percentage of your Receivables for repayment. This amount is based on your Utilization of the Credit Limit.

(See the Agreement for more detail)

| **Applicable APR** | **EFFR + 10.00%** | This is the annualized cost to you.<br><br>There are no late payment fees, underwriting fees, or any other hidden fees.<br><br>(See the Agreement for more detail) |
|---|---|---|
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges? | **NO** |

Exhibit 1

**1. INTRODUCTION.** This Growth Line of Credit Agreement (together with the accompanying Growth Line of Credit Agreement Supplement ("Supplement") and the accompanying Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits), the "Agreement") governs your revolving business line of credit and security agreement and any and all Advances (as defined below) hereunder (together, the "Line of Credit") from Ampla, LLC. Please read it and keep it for your reference. In this Agreement, "Borrower" means the Borrower identified on the signature page of this Growth Line of Credit Agreement. The word "Lender" means Ampla, LLC, its agents and representatives, as well as its successor(s) and assign(s).

**2. CERTAIN DEFINITIONS.** For purposes of this Agreement, the term:

"Access Details" means the username, login and password details for Borrower's Designated Checking Account, Card Processor Account(s), Ecommerce Account(s), and third-party services which include, but are not limited to, Digital Marketing Accounts and such other accounts as may be required from time to time, provided by Borrower to Lender as part of the application process, either directly or via 3rd party authentication services;

"Advance" shall have the meaning set forth in Section 8;

"Advance Rate," means, the applicable percentage set forth in the above Supplement, or such higher or lower percentage as determined by Lender in its sole discretion from time to time;

"Advance Request" shall have the meaning set forth in Section 9;

"Applicable APR" means, as of any date of determination, the annual percentage rate then identified as the Applicable APR in the Online Account; it being acknowledged and agreed that (x) the Applicable APR shall equal the Base Rate plus the Applicable Margin; and (y) any such increase or decrease shall in no way affect Borrower's obligation to pay any amounts owed by Borrower hereunder; notwithstanding the foregoing, for Texas Borrowers only, the Applicable APR shall not exceed the weekly ceiling applicable to extensions of commercial credit only, as such weekly ceiling is defined in the Texas Finance Code and as documented in the Texas credit letter published weekly by the Texas Office of Consumer Credit Commissioner;

"Applicable Margin" means, as of any date of determination, the annual percentage rate then identified as the Applicable Margin in the Online Account, it being acknowledged and agreed that the initial Applicable Margin shall equal the amount set forth on the accompanying Supplement;

"Available Advance Amount" means, as of any date of determination, an amount equal to (1) the Credit Limit, minus (2)

Principal Outstanding, minus (3) Third-Party Financing obligations outstanding;

"Base Rate" means, as of any date of determination, a rate per annum rounded upwards, if necessary, to the nearest 1/100 of 1% (2 decimal places) equal to the rate of interest which is identified and normally published by the New York Federal Reserve at approximately 9:00 AM on the business day prior to the date of determination for the date that is two (2) business days prior to the date of determination, on a webpage called the Effective Federal Funds Rate ("EFFR") (or any equivalent page used by the New York Federal Reserve or, if the New York Federal Reserve no longer reports the EFFR, another nationally-recognized rate reporting source acceptable to Lender), calculated as a volume-weighted median of overnight federal funds transactions reported in the FR 2420 Report of Selected Money Market Rates. For the avoidance of doubt, the Base Rate as of any date of determination shall be the EFFR as of two (2) business days prior. If the New York Federal Reserve (or another nationally-recognized rate reporting source acceptable to Lender) no longer reports the EFFR, Lender may select a comparable replacement index or replacement page, as the case may be, in its sole discretion. Notwithstanding the foregoing, in no event shall the Base Rate be less than two percent (2.00%) at any time.

"Card Processer Account" means, Borrower's payment processor account with Shopify Pay, Stripe, or such other third-party card processor deemed acceptable to Lender at Lender's sole discretion;

"Collection Amount" means, with respect to each day Obligations remains outstanding, the amount that Lender is entitled to debit from the Designated Checking Account, which shall equal the applicable amount of the Daily Receivables for the prior day multiplied by the Collection Percentage;

"Collection Percentage" means the daily collection percentage of Daily Receivables set out in Lender's Collection Percentage Grid as made available to Borrower via the Online Account;

"Collection Percentage Grid" means, the schedule as set forth in the Online Account of (i) the Collection Percentage, which is a relational function determined in Lender's sole discretion based on (ii) Credit Limit Utilization;

"Credit Limit" means, as of any date of determination, the amount then identified as the Credit Limit in the Online Account; it being acknowledged and agreed that the Credit Limit shall be equal to: (i) "Monthly Cashflows" multiplied by the "Advance Rate"; but in no event shall the Credit Limit exceed the Maximum Line Size;

"Credit Limit Utilization" means, as of any date of determination, a percentage equaling: the maximum of, for all Advances that remain outstanding, (x) the total Principal

DocuSign Envelope ID: 8BE39BA3-B94B-4489-8A75-A0D250CE5A7A

# GROWTH LINE OF CREDIT AGREEMENT

Outstanding at the time of disbursement of such Advance, divided by (y) the Credit Limit at the time of disbursement of such Advance; it being understood that the greater the Credit Limit Utilization, the greater the Collection Percentage will be, as determined in Lender's sole discretion;

"Daily Interest Charge" means, as of any date of determination, an amount equal to the product of (x) the Daily Interest Rate; and (y) Principal Outstanding as of such date immediately prior to any application and allocation of principal in connection with any payment, if any, made by Borrower on such date, as set forth on the Lender's books and records;

"Daily Interest Rate" means, a non-compounding rate obtained by dividing (x) the Applicable APR by (y) three hundred and sixty (360);

"Daily Receivables" means, with respect to any particular day, the total amount of Receivables received on such day;

"Debit Schedule" shall have the meaning set forth in Section 11;

"Designated Checking Account" shall be a checking account in Borrower's name and hosted at a banking institution chosen by Lender in Lender's sole discretion;

"Digital Marketing Account" means, Borrower's accounts with Google (including AdWords and Analytics), Facebook, and any other third-party digital marketing platform through which Borrower purchases advertisements;

"Ecommerce Platform" means Shopify or such other ecommerce platforms as approved in Lender's sole discretion;

"Interest Outstanding" means, as of any date of determination, the aggregate amount of accrued and unpaid interest as set forth on the Lender's books and records;

"Maximum Line Size" means the capped ceiling as set and as may be increased by Lender in its sole discretion for total Advances Lender will make under this Agreement, notwithstanding any other terms to the contrary, as set forth initially in the Supplement and as updated by Lender in the Online Account;

"Monthly Cashflows" means, the lesser of (a) the last 30 days of revenue-related cash receipts and (b) the 30-day average of the last 90 days of revenue-related cash receipts, adjusted at Lender's sole discretion for seasonality, accounts receivable, uninvoiced sales orders, expected future growth, historical non-recurring sales, and such other factors to allow Lender in its sole discretion to estimate Borrower's future, near-term, anticipated Receivables for purposes of underwriting and approving, again in its sole discretion, Advances hereunder. For the avoidance of doubt, Monthly Cashflows shall only include ecommerce sales made through a Card Processor Account and retail sales made through

acceptable retail channels. The retail channels considered acceptable are determined at Lender's sole and absolute discretion;

"Obligations" means, with respect to Borrower, all obligations to perform acts and refrain from taking action hereunder, including, without limitation, obligations to pay all amounts owed hereunder including, without limitation, Principal Outstanding and Interest Outstanding;

"Online Account" means, Borrower's login details and account information on Lender's online customer portal;

"Principal Outstanding" means, as of any date of determination, the aggregate outstanding principal balance of all Advances hereunder as set forth on the Lender's books and records, which, for the avoidance of doubt, does not include interest as Lender does not compound interest;

"Processing Trial" shall have the meaning set forth in Section 8;

"Receivables" means any and all cashflows that Borrower generates as part of its business;

"Scheduled Payment Date" means every business day in which the bank hosting the Designated Checking Account is open for business;

"Supplement" means the summary of certain terms included at the beginning of this Agreement and forming a part of this Agreement; and

"Third-Party Financing" means Borrower's outstanding debt-financing obligations to third-parties, including but not limited to, credit card advance companies, cash advance companies, or working capital lenders.

**3. EFFECTIVE DATE.** This Agreement begins on the date Lender countersigns, below. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower under the Line of Credit (including, for the avoidance of doubt, any and all Advances) until Lender has received the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits).

**4. AUTHORIZATION.** Borrower agrees that the Line of Credit (including, for the avoidance of doubt, any and all Advances) made by Lender to Borrower and any and all Advance Requests (as defined below) shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to duly authorized requests on its behalf.

**5. ACCESS TO ONLINE ACCOUNT.** When Borrower signs in to its Online Account, Borrower can obtain information about Borrower's Line of Credit, make an Advance Request as

DocuSign Envelope ID: 8BE39BA3-B94B-4489-BA75-A0D250CE5A7A

provided for herein and perform such other actions made available by Lender from time to time. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's username and password to Borrower's Online Account with any third-party. Borrower must promptly report any unauthorized use of Borrower's Online Account to Lender by telephone at (833) 678-7483 or by email at compliance@getampla.com.

**6. LINE OF CREDIT FOR SPECIFIC PURPOSES ONLY.**
The proceeds of the Line of Credit (including, for the avoidance of doubt, any and all Advances) may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 52 below, and not for any other purposes. In addition, the Line of Credit (including, for the avoidance of doubt, any and all Advances) will not be used for personal, family or household purposes, and Borrower is forever estopped from taking the position that such Loan (including Advances) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the proceeds of the Line of Credit (including, for the avoidance of doubt, any and all Advances) for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply to the Line of Credit (including, for the avoidance of doubt, any and all Advances), the Online Account or this Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Line of Credit (including, for the avoidance of doubt, any and all Advances) conforms to this section. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Line of Credit (including, for the avoidance of doubt, any and all Advances) is in fact obtained or used or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Line of Credit (including, for the avoidance of doubt, any and all Advances) been made for personal, family or household purposes.

**7. MAINTENANCE OF BORROWER'S BANK ACCOUNT; DUTY TO COLLECT RECEIVABLES; DUTY TO HOLD RECEIVABLES IN TRUST.**

A. Borrower agrees to maintain funds in the Designated Checking Account in amounts that are sufficient to enable the processing of any payment that Borrower is obligated to pay Lender pursuant to this Agreement. Borrower shall keep the Designated Checking Account open until the Principal Outstanding, the Interest Outstanding, and any and all other amounts owed hereunder have been paid to Lender in full and no further Advances are to be made hereunder.

B. Borrower further agrees to collect all Receivables diligently and promptly in accordance with applicable law, to diligently and

promptly account for and report to Lender all Receivables due and unpaid and all payments received in connection with any and all Receivables, in accordance with the terms of this Agreement, in order to allow us to debit the Designated Checking Account for the Collection Amount in accordance with the terms of this Agreement.

C. Borrower further agrees to hold the Receivables and all payments received in connection therewith in trust for Lender and not sell or otherwise transfer, convey or dispose of the Receivables inconsistent with the terms of this Agreement.

**8. ADVANCES; PROCESSING TRIAL.**

A. Subject to the terms and conditions hereunder, the Lender may in its sole and absolute discretion make an advance to the Borrower under the Line of Credit following its receipt of an Advance Request (as defined below) by disbursing proceeds from time to time to the Borrower in the manner set forth herein (each an "Advance" and, collectively "Advances"). Borrower acknowledges and agrees that the Lender shall not be required to, and the Borrower shall not request the Lender to, make an Advance (i) in an amount that is less than certain minimum advance amounts established by Lender in its sole and absolute discretion from time to time, (ii) in an amount that exceeds the Available Advance Amount as of such date. In the event that Lender has made an Advance in an amount that exceeds the Available Advance Amount as of the date of such Advance, Borrower agrees (x) at Lender's request, to immediately repay the amount of such excess; and (y) that any such excess will not be deemed to constitute an increase in the Credit Limit hereunder.

B. Following the entry into this Agreement, but prior to any Advance to Borrower, Borrower hereby permits Lender to conduct a preliminary processing trial to test: (a) that the ACH payment functionality with Borrower is operating as Lender expects; (b) that Lender can access data within the Card Processor account and/or Ecommerce Platform account correctly; (c) that Borrower's transactions are being correctly processed through the Card Processor or Ecommerce Platform and are visible to Lender as Lender requires; and (d) such other related activities and functionalities Lender deems reasonably necessary to provide for the smooth functioning of the activities contemplated by this Agreement; (together, the "Processing Trial"). For the avoidance of doubt, any trials or tests of ACH payment transactions pursuant to this paragraph will be for a nominal amount (and in any case not more than $50), and will be refunded to Borrower in full or deducted from the Collection Amount (in either case, at Lender's sole discretion). Lender will make a determination as to whether to issue an Advance to Borrower promptly after the commencement of the Processing Trial. Nothing herein will create an obligation on Lender's behalf to issue the Advance to Borrower, and Lender expressly reserves the right to terminate the Agreement if Lender determines in Lender's absolute discretion that the Processing Trial has been unsuccessful, in which case, this Agreement will automatically

terminate and Lender will promptly repay to Borrower any funds received by Lender from Borrower in connection with the Processing Trial.

**9. ADVANCE REQUESTS.** The Borrower may request an Advance ("Advance Request") by (i) accessing the Online Account and completing the steps delineated therein for the online submission of an Advance Request or (ii) using any other method that Lender may in its sole and absolute discretion make available to Borrower from time to time. Following Lender's approval of an Advance Request, Lender will make an Advance to Borrower by disbursing the related proceeds by making an ACH credit or wire transfer to the Designated Checking Account. Borrower expressly acknowledges that, due to transaction processing, proceeds from any Advance disbursement may take up to two (2) business days following Lender's approval of the related Advance Request to be actually received by the Borrower.

**10. CONDITIONS OF WILLINGNESS TO CONSIDER LENDING.** Lender may decide not to approve an Advance Request or suspend Borrower's ability to make an Advance Request if on the date of such Advance Request, (i) Borrower's representations and warranties set forth in this Agreement are untrue or incorrect on the date of such Advance Request and/or an earlier date contemplated by such representation or warranty; (ii) an event has occurred that constitutes an Event of Default hereunder or which, with notice or the passage of time or both, would constitute an Event of Default hereunder, (iii) the amount of the Advance being requested by Borrower pursuant to such Advance Request exceeds the Available Advance Amount.

**11. INTEREST ON ADVANCES; DEBIT SCHEDULE; RIGHT TO PREPAYMENT.**

A. Advances shall accrue interest daily in an amount equal to the Daily Interest Charge and shall be payable in arrears on each Scheduled Payment Date. Interest payable shall be computed on the basis of a 360-day year, 30-day month.

B. Principal and interest on the Advances and other amounts owed hereunder shall be regularly paid by the Borrower as set forth below (the "Debit Schedule"). Borrower covenants and agrees that Borrower will cause all Receivables to be paid into the Designated Checking Account. Borrower hereby authorizes Lender to originate a debit or debits from the Designated Checking Account to provide for the payment each day of the Collection Amount, which is determined each day based on the Collection Percentage. Borrower will not change the Card Processor or Ecommerce Platform without Lender's prior written consent. Each day Obligations remain outstanding, Lender will calculate the Collection Amount to which Lender is entitled under this Agreement, based on the agreed Collection Percentage and the previous day's total daily sales as recorded in either the Card Processor account or Ecommerce Platform account, as applicable. ACH payments will be initiated for each Collection Amount. ACH payments can only be initiated on business days.

No further collections or ACH payments will be taken after Obligations are paid in full. Borrower acknowledges and agrees that should Lender fail to receive any portion of the foregoing payment amount on any Scheduled Payment Date, the Lender is authorized, but not required, to initiate ACH debit entries to the Designated Checking Account on any subsequent business day until such payment amount and any and all other amounts owed hereunder, in each case as set forth in the Lender's books and records are paid in full.

C. Borrower has the right to prepay all Obligations at any time without penalty.

**12. PROMISE TO PAY.** Borrower agrees to make to Lender, and authorizes Lender to collect, each of the payments (i.e., debits) contemplated by Section 11 in the manner contemplated thereby and as provided in the accompanying Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits). For the avoidance of doubt, Borrower agrees to pay Lender the balance of all Obligations in accordance with the terms of this Agreement.

**13. ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable originate a debit or debits from the Designated Checking Account to provide for the payment each day of the Collection Amount, the Borrower shall make expedient efforts (and in no event more than 24 hours late) to transfer funds to Lender via wire transfer, automatic transfer, or via another online service provided by Lender from an account at an institution offering such service in U.S. Dollars.

**14. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments between principal and interest owed hereunder in any manner Lender chooses in Lender's sole discretion; it being understood that the Lender will generally allocate and apply payments in the following sequential order: (i) Interest Outstanding; and (iii) the Principal Outstanding.

**15. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor. Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement and Borrower is estopped from asserting otherwise.

**16. RIGHT TO PAY TOTAL OBLIGATIONS AT ANY TIME.** Borrower may pay off Borrower's Line of Credit in

whole on any business day by paying Lender the sum total of all Obligations owed hereunder.

## 17. SECURITY INTEREST; PROTECTING THE SECURITY INTEREST; LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.

A.  Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all Obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description whether owing under this Agreement or any other agreement, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, Interest Outstanding.  The Collateral includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof:  (i) all Receivables including but not limited to any amounts owing to Borrower now or in the future; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.  Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

B. Borrower agrees that Lender may file any financing statement, lien entry form or other document Lender requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender as may be necessary to accomplish said filing and to do whatever Lender deems necessary to protect Lender's security interest in the Collateral.

C. Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of Receivables, other accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof.  Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.  All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender.  This requirement, however, does not constitute consent by Lender to any such disposition.

## 18. TAXES, ASSESSMENTS AND LIENS. Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

## 19. INSURANCE. Borrower shall procure and maintain insurance with insurance companies that the Borrower believes are financially sound and reputable, in such amounts with such deductibles and covering such risks as the Borrower believes in good faith are customarily carried by companies engaged in similar businesses. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.  Borrower shall add Lender to any certificates of insurance in the ordinary course of business while Obligations remain outstanding.

## 20. REPAIRS AND MAINTENANCE. As applicable and specific to the type of Collateral at issue, Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance (other than a lien or encumbrance by the Lender) may ever attach to or be filed against the Collateral.

## 21. USE OF TESTIMONIALS. Subject to Borrower's consent, Lender may obtain testimonials, including testimonials on why Borrower needed the Line of Credit and how the Line of Credit has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower grants Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purpose,

with any Lender employees and agents and with the general public. Lender may, but is not required to, use the name of any Borrower as a credit in connection with any photograph and testimonial. Borrower and each signatory of Borrower waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each signatory of Borrower release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**22.    BORROWER'S    REPRESENTATIONS    AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower is not a sole proprietorship; (ii) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (iii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iv) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (v) the true and correct legal name of the Borrower is set forth in the application; (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws, and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or

prospects or the value of the Collateral; (ix) Borrower has disclosed in writing to Lender all of its Third-Party Financing obligations; (x) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of the Collateral before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months of the date hereof; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States Bankruptcy Code.

**23. BORROWER'S OPERATING COVENANTS.** Borrower covenants, and without limitation to any other representations, warranties or covenants in this Agreement: (i) to maintain existing lines of business; (ii) to not incur Third-Party Financing obligations without the prior written consent of Lender; (iii) to not divert any Receivables away from the Designated Checking Account to any other account held by any institution, without the prior written consent of Lender; (iv) to not close the Designated Checking Account nor deny Lender access thereto, or instruct or, except to the extent prohibited by applicable law, acquiesce to, any bank or other person closing such Designated Checking Account or denying Lender access thereto; (v) to not enter into any deposit account control agreement related to the Designated Checking Account; and (vi) to not take any steps to avoid, delay, or circumvent Borrower's obligation to make Receivables promptly available to Lender in the Designated Checking Account at any time, including without limitation by: (a) taking any action that might discourage Borrower's customers' use of credit cards, debit cards or other payment cards, and Borrower will not permit any event to occur that may have an adverse effect on the use, acceptance or authorization of credit cards, debit cards, or other payment cards; (b) changing or adding any credit card processors or e-commerce platforms without Lender's prior written consent; (c) amending or terminating the processing agreement with the Card Processor without Lender's prior written consent; (d) not promptly transferring Receivables into the Designated Checking Account from any third-party account hosting said Receivables, to which Borrower has transfer access, within 14 days of receipt in such third-party account, or within the earliest-allowed, but later period of time if and only if mandated by such third-party's account-transfer rules; or (e) putting a stop order or blocking any ACH or other remittance of Receivables to Borrower, or taking any action that results in a stop order or block.

**24. INTEREST EXCEEDING PERMITTED LIMIT.** If the Line of Credit is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if

required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**25. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower authorizes Lender to obtain business and personal credit bureau reports in Borrower's name at any time and from time to time for purposes of deciding whether to approve the requested Line of Credit and any Advances made pursuant hereto or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's request, Lender will advise Borrower if Lender obtained a credit report and Lender will give Borrower the credit bureau's name and address. Borrower agrees to submit current financial information, a new credit application, or both, in Borrower's name at any time promptly upon Lender's request. Lender may report Lender's credit experiences with Borrower to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower is hereby notified that a negative credit report reflecting on Borrower's credit record may be submitted to a credit reporting agency if Borrower fails to fulfill the terms of their respective credit obligations hereunder.

**26. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations, or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender rights hereunder. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will be payable on demand. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**27. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower agrees to provide Lender with such information about the financial condition and operations of Borrower, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both,

would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**28. TELEPHONE COMMUNICATIONS.** Borrower and hereby expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, marketing partners, agents and others calling at Lender's request or on its behalf, at any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers). Borrower agrees that such communications may be initiated using an automated telephone dialing system.

**29. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damages, liabilities or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**30. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not, without Lender's written consent: (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation. Notwithstanding the foregoing, no consent shall be required of Lender if, following any such merger, consolidation, sale, joint venture, partnership or other transaction, (x) the current majority owner of Borrower remains the majority owner of Borrower post transaction, and (y) any transfer of equity in Borrower to any person following such transaction is no more than 40% of all equity outstanding in Borrower.

**31. CHANGE IN LEGAL STATUS.** Without Lender's consent, Borrower represents and agrees that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such organizational identification number.

**32. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Borrower fails

DocuSign Envelope ID: 88E50BA3-B94B-4489-BA75-A0D250CE5A7A
Case 24-50792-hlb Doc 852 Entered 12/30/24 19:00:45 Page 43 of 73

GROWTH LINE OF CREDIT
AGREEMENT
Main Document

to comply with the Debit Schedule in any respect; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any other term, condition or promise within this Agreement, including but not limited to providing Access Details and similar reports and other information Lender requires; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or the Collateral, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other

agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company, or an additional working capital loan without the prior written consent of Lender); (ix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to the Collateral; (xxi) any act by or against, or relating to Borrower or the Collateral pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of the Collateral; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or Borrower denies it has any further liability or obligation hereunder; (xxiv) any person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his support agreement in favor of Lender; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held), provided, however, that any such change in compliance with paragraph 30 hereof shall not be deemed "material" for the purposes of this section xxv; (xxvi) if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**33. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Refrain from Making Advances and Terminate Borrower's Ability to Make Advance Requests: Lender may terminate the Line of Credit, refrain from making Advances and/or terminate Borrower's ability to make Advance Requests hereunder.

B. Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account any and all amounts to bring current all Obligations.

C. Accelerate Indebtedness: Lender may declare any and all Obligations immediately due and payable, without notice of any kind to Borrower.

D. Assemble Collateral: Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all

certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

E. Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower other persons as required by law (if any), reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All reasonable and customary expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F. Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

G. Collect Revenues, Apply Accounts: Lender, either itself or

through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

H. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**34. CONSENT TO JURISDICTION AND VENUE.** Subject to Section 35 below, Borrower and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be brought in any court of the state of New York or in the United States District Court for the Southern District of New York, and

Borrower waives personal service of process. Borrower and Lender agree that venue is proper in such courts.

**35. ARBITRATION AND CLASS ACTION WAIVER. THE PARTIES AGREE THAT AT THE ELECTION OF ANY PARTY, ALL CLAIMS BETWEEN BORROWER AND LENDER SHALL BE RESOLVED THROUGH MANDATORY BINDING INDIVIDUAL ARBITRATION PURSUANT TO THIS SECTION.**

A. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. Other rights that Borrower or Lender would have in court may also not be available in arbitration. For example, under this arbitration agreement, Borrower or Lender will not have the right to (i) have a court or jury decide the claim being arbitrated, (ii) engage in pre-arbitration discovery to the same extent that Borrower or Lender could in court, (iii) as set forth below, participate as a representative or member of any class or of claimants in a class action, in court or in arbitration, relating to any claim subject to arbitration, or (iv) join or consolidate claims other than Borrower's or Lender's own claims. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

B. The term "Claims" is to be given the broadest possible meaning, and includes without limitation Claims arising from or relating to (i) this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection or enforcement of any obligation arising from this Agreement, (v) advertisements, promotions, or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, (vi) Claims between Borrower and and Lender or Lender's parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement, and (vii) Claims regarding the validity, enforceability, or scope of this Arbitration section or this Agreement, including but not limited to whether a given claim or dispute is subject to arbitration.

C. The parties agree that any Claim against Borrower or Lender shall be, at the election of any party, resolved by mandatory binding arbitration within a reasonable time period not to exceed one-hundred-and-eighty (180) days. The parties agree that the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the JAMS Streamlined Arbitration Rules & Procedures except as otherwise agreed in this Agreement; if JAMS is unavailable to administer the arbitration, then the arbitration shall be administered by the American Arbitration Association in accordance with its procedures or any other mutually agreeable arbitrator. The parties agree that the

arbitration shall be conducted by a single arbitrator. The arbitrator shall be chosen in accordance with the procedures of JAMS and shall base the award on applicable law. The arbitration hearing shall occur in the federal judicial district where Borrower is located, and may be conducted on the basis of documents only or through a telephone or in-person hearing. The arbitrator's decisions are final and binding, are as enforceable as any court order, and are subject to very limited review by a court as set forth in the Federal Arbitration Act. Judgment on the award may be entered in any court having jurisdiction, subject to Section 34 above.

D. The parties agree that the costs of the arbitration (including the arbitrator's fees) shall be divided equally between them, except that Lender will consider in good faith a request by Borrower to pay the costs of arbitration.

E. EACH PARTY MAY PURSUE ARBITRATION SOLELY IN AN INDIVIDUAL CAPACITY, AND NOT AS A REPRESENTATIVE OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S OR ENTITY'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER AND LENDER WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

F. If this provision is deemed by a court or arbitrator to be unenforceable only as to some Claims asserted by a party, then the parties agree in advance that all proceedings relating to the Claims against which this provision is unenforceable should be stayed and not proceed pending the completion of the arbitration proceeding on all remaining claims.

G. If Borrower or Lender files a Claim in court, such action is not deemed to be a waiver of the right to compel arbitration of any counterclaims, cross-claims, or separate claims that may be asserted against it. In such a case, upon the election of any party,

DocuSign Envelope ID: 88530BA3-B94B-4489-BA75-A0BF50F55A7A

the entire dispute shall be resolved in arbitration pursuant to the provisions of this section.

H. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, other applicable federal law, and, to the extent it is applicable, by New York law.

**36. JURY TRIAL WAIVER.** To the extent not prohibited by applicable law, Borrower and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 35, any such claim or cause of action shall be tried by court sitting without a jury.

**37. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**38. TERMINATION.** This Agreement shall be effective as of the date first written above and shall continue in full force and effect until the first anniversary thereof, unless earlier terminated upon an Event of Default. This Agreement shall be automatically extended for one-year terms on each anniversary of the effective date (each such anniversary, an "Anniversary Date") unless Lender or Borrower gives the other party written notice of termination at least thirty (30) days prior to the end of the applicable Anniversary Date, or until terminated earlier upon and event of Default. Notwithstanding the foregoing, (i) this Agreement shall not terminate until Borrower has paid in full all amounts owed pursuant to the Obligations; and (ii) in addition to Lender's rights and remedies set forth herein, Lender may, at any time and subject to applicable law, terminate this Agreement and Borrower will nevertheless continue to be obligated to pay all amounts owed pursuant to the Obligations.

**39. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business.

To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. For the avoidance of doubt, Borrower and Lender and their successors or assigns retain the right to compel arbitration under Section 35 even if they assign any rights under this Agreement to another individual or entity.

**40. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**41. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**42. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; by nationally recognized overnight courier, or when sent by electronic mail. Notice to Borrower may also be posted to Borrower's Online Account or sent to Borrower's last known address, or electronic mail address in Lender's records for Borrower. Notice to Lender may be sent to: Ampla, LLC, attention: Anthony Santomo, Founder and CEO, 1239 Broadway, 12ᵗʰ Floor, New York, NY 10001.

**43. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of the Collateral (including without limitation the Receivables). At Lender's request, Borrower shall deliver to Lender: (i) schedules of the Collateral (including without limitation the Receivables); and (ii) such other information regarding the Collateral (including without limitation the Receivables) as Lender shall request. Lender, or any of its agents, shall have the right to call at any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers), at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the

DocuSign Envelope ID: 88530BA1-B94B-4489-BA75-A0BF50F55A7A

# GROWTH LINE OF CREDIT AGREEMENT

books, records, journals, orders, receipts, correspondence that relate to the Collateral (including without limitation the Receivables) or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for the Line of Credit by a third-party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing accounts made through such Referring Party's referrals.

**44. CHANGE IN TERMS UPON SUCCEEDING ADVANCE REQUEST ONLY**. Lender may change any of the terms of this Agreement, provided, however, that Lender will notify Borrower of such changes (by posting or otherwise reflecting such change in the Online Account) and such changes shall only become effective as of the immediately succeeding Advance Request.

**45. GOVERNING LAW.** Subject to Section 35 above, our relationship (including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement) is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law), New York law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**46. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any other person who has obligations pursuant to this Agreement, to the extent not prohibited by applicable law, hereby waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: (i) Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement; and (ii) Lender may, but will not be obligated to, sue one or more persons without joining or suing others.

**47. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail or via the Borrower's Online Account.

**48. CONFIDENTIALITY.** Borrower shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents for purposes of satisfying the Obligations pursuant to this Agreement.

**49. ENTIRE AGREEMENT.** Any application Borrower signed or otherwise submitted in connection with this Agreement, the accompanying Supplement and the Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Line of Credit and/or Online Account are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**50. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic transmission shall be treated in all respects as original signatures.

**51. CUSTOMER SERVICE CONTACT INFORMATION**. If you have questions or comments about your Online Account, you may contact us by (i) e-mail at accountmanagement@getampla.com, (ii) telephone at (833) 678-7483, or (iii) mail at Ampla, LLC, 1239 Broadway, 12th Floor, New York, NY 10001.

**52. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms. Each person executing certifies that each person is executing on behalf of the Borrower and/or in the capacity indicated (and if Borrower is a sole proprietorship, in the capacity of the owner of such sole proprietorship) and that such person is authorized to execute this Agreement on behalf of or in the stated relation to Borrower.

Use of Proceeds Certification

As referred to in Section 6, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Line of Credit (including, for the avoidance of doubt, any and all Advances) will be used solely for the following purposes only:

- Purchases of inventory, raw materials, packaging, or other specified goods;
- Manufacturing payments;

DocuSign Envelope ID: 88E30BA3-B948-4489-BA75-A09D50BF5A7A

- Payments to shipping and/or fulfillment partners;
- Purchases of marketing and advertising services; and
- To the extent not included above, other general and administrative costs as determined by Lender in its sole discretion.

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits") (the "Authorization") is part of (and incorporated by reference into) the Growth Line of Credit Agreement (the "Agreement"). Borrower should keep this important legal document for Borrower's records.

**DISBURSEMENT OF ADVANCE PROCEEDS.** By executing this Authorization, Borrower authorizes Lender to disburse Advance proceeds (less the amount of any applicable fees) by initiating an ACH credit, wire transfer or similar means to the Designated Checking Account (as such term is defined in the Agreement). This Authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**CONSENT TO DEBIT SCHEDULE AS SET FORTH IN AGREEMENT.** By executing this Authorization, Borrower agrees to, and hereby, authorizes Lender to collect payments required under the terms of Borrower's Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the Debit Schedule as set forth in the Agreement. Borrower authorizes Lender to assess multiple ACH debits to pay down Obligations, if necessary pursuant to and consistent with the Agreement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's rights under the Agreement, however, if Borrower fails to keep Borrower's Designated Checking Account in good standing or if there are insufficient funds in such account or if Lender is unable to collect any amounts by ACH debit owed to Lender under the Agreement. If Borrower revokes the authorization, or Lender suspends or terminates Borrower's rights under the Agreement, the Obligations remain outstanding and Lender reserves all rights under the Agreement accordingly.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.

| | | | |
|---|---|---|---|
| Routing Number: | 051402372 | Account Number: | 8760683784 |

Tax ID: 452548672

By: _(Signature)_

Name: Erin Burke

Date: 9/27/2022

**Signature Page**

I hereby, as a duly authorized agent of Borrower, affirm that I have read and understand the terms and conditions of, consent to, and agree to be bound by, the Growth Line of Credit Agreement, the accompanying Supplement, and the accompanying Authorization Agreement for Direct Deposit (ACH Credits) and Direct Payments (ACH Debits).

Borrower State of Incorporation:  <u>OHIO</u>

Borrower Headquarters State:  <u>OHIO</u>

Borrower Headquarters Address:  <u>1419 Boardman-Canfield Rd, STE 280, Youngstown, OH 44512</u>

**BORROWER: BURKE DECOR, LLC**

By: _____

(Signature)

Name: <u>Erin Burke</u>

Its: <u>MEMBER</u>

Date: <u>9/27/2022</u>

**LIMITED GUARANTY.** The guarantor signing below is an owner or partial owner of the Borrower ("Limited Guarantor").  The Limited Guarantor understands and agrees that he or she, in his or her individual and personal capacity, shall be liable, but only liable, for losses and/or damages caused by Borrower's gross negligence, willful misconduct, misrepresentation or fraud.  Such Limited Guarantor will benefit by the transactions contemplated under this Agreement, and Lender executes this Agreement based on such Limited Guarantor agreeing to this Limited Guaranty.

By: _____

(Signature)

Name: <u>Erin Burke</u>

Date: <u>9/27/2022</u>

<u>For Lender's Use Only</u>: This Agreement has been received and accepted by Lender.

By: _____

(Signature)

**Anthony Santomo**

Date: <u>9/27/2022</u>

**[REST OF PAGE LEFT INTENTIONALLY BLANK]**

**Ampla**

August 17, 2023

Burke Decor, LLC
1419 Boardman-Canfield Road, STE 280
Youngstown, OH 44512
Attn: Erin Burke

Re:    <u>Notice of Event of Default and Opportunity to Cure
      through 12:01 a.m. ET, Friday, August 25, 2023</u>

Dear Erin Burke,

As you know, on or about September 27, 2022, Burke Decor, LLC, as borrower ("Borrower"), and Ampla, LLC, as lender ("Lender"), entered into that certain Ampla Growth Line of Credit Agreement ("Credit Agreement"). Capitalized, though undefined terms as used herein, shall have their meaning as defined in the Credit Agreement.

The Credit Agreement, Section 6, provides in pertinent part: "6. LINE OF CREDIT FOR SPECIFIC PURPOSES ONLY. The proceeds of the Line of Credit (including, for the avoidance of doubt, any and all Advances) *may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 52 below, and not for any other purposes* …" (emphasis added).

The Credit Agreement, Section 52, provides in pertinent part: "52. CERTIFICATION AND SIGNATURES. … <u>Use of Proceeds Certification</u> As referred to in Section 6, by signing below, *the Borrower certifies, acknowledges and understands that the proceeds from the requested Line of Credit (including, for the avoidance of doubt, any and all Advances) will be used solely for the following purposes only*: • Purchases of inventory, raw materials, packaging, or other specified goods; • Manufacturing payments; • Payments to shipping and/or fulfillment partners; • Purchases of marketing and advertising services; and • To the extent not included above, other general and administrative costs as determined by Lender in its sole discretion" (emphasis added).

The Credit Agreement, Section 32, provides in pertinent part: "32. DEFAULT. The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement … (ii) *Borrower fails to comply with, promptly, punctually and faithfully perform or observe any other term*, condition or promise within this Agreement …" (emphasis added).

Exhibit 2

**Ampla**

It has come to our attention that you have violated numerous of the aforementioned provisions of the Credit Agreement, specifically by wrongfully diverting Advance proceeds to corporate affiliates outside the relatively broad, but limited and enumerated scope as outlined above. Therefore, Lender hereby declares an Event of Default, and even though not required under the Credit Agreement, hereby provides you 5 business days' notice and opportunity to cure said Event of Default, which, for the avoidance of any doubts, shall be cured on or before 12:01 a.m. ET, Friday, August 25, 2023.

Lender reserves all rights and remedies under the Credit Agreement and applicable law. Please govern yourself accordingly.

Sincerely,

Jim Cummings, COO, Ampla, LLC

DocuSign Envelope ID: 4B777AAA-6DF6-41D5-B1D8-BCFDA42EC66D

**Ampla**

October 19, 2023

Burke Decor, LLC
1419 Boardman-Canfield Rd., Ste. 280
Youngstown, OH 44512
Attn: Erin Burke

**Re:    FORBEARANCE AND SECURED CORPORATE GUARANTY AGREEMENT**

Dear Ms. Burke:

On or about September 27, 2022, Burke Decor, LLC as borrower ("<u>Borrower</u>"), Ms.
Erin Burke as limited guarantor ("<u>Limited Guarantor</u>") and Ampla, LLC as lender
("<u>Lender</u>"), executed that certain Growth Line of Credit Agreement ("<u>Credit
Agreement</u>").    Borrower, Limited Guarantor, Lender as well as the Secured
Corporate Guarantors (defined below), shall be referred to as the "<u>Parties</u>."
Capitalized terms not otherwise defined herein however shall have their meaning
as defined in the Credit Agreement.

Lender sent Borrower a letter dated August 17, 2023 entitled: "Notice of Event of
Default and Opportunity to Cure through 12:01 a.m. ET, Friday, August 25, 2023"
("<u>Default Letter</u>).  The Default Letter advised Borrower of several Events of Default
with respect to the wrongful diversion of Advance proceeds in violation of the
Credit Agreement.  The Default Letter provided Borrower, though not required by
the Credit Agreement, five (5) business days' notice and opportunity to cure said
Events of Default. Lender asserts they were not cured by the deadline. Pursuant to
the Credit Agreement, Section 33(C), Lender asserts it can accelerate the balance
of Obligations, which as of today's date is $7,469,495.00, plus hereinafter accruing
contractual interest ("<u>Balance</u>").  Lender asserts that the Balance is now due and
owing, in full.  Borrower admits that the Balance is now due and owing, in full, to
Lender.

Nevertheless, the Parties have recently had several constructive conversations,
and in pursuance thereof, the Parties enter into this forbearance and secured
corporate guaranty agreement ("<u>Forbearance Agreement</u>"), in which, Borrower
agrees to comply with the following payment and other terms.  In Lender's
consideration of Borrower's agreement to abide by the terms of the Forbearance
Agreement, and in lieu of Lender exercising at this immediate time any and all
remedies to which it asserts it is entitled pursuant to the Credit Agreement, Section
33, as well as applicable law, the Parties agree as follows:

Exhibit 3

DocuSign Envelope ID: 4B777AAA-6DF6-41D5-B1D8-BCFDA42EC66D

1.    **Borrower's Weekly Wire Transfer Payments.**

Commencing Thursday, October 19, 2023, and repeating every Thursday thereafter, and should a Thursday be a non-banking day, then the very next day (Friday), Borrower shall wire transfer to the Lender Wire Account (as defined below) the following payments: (i) for weeks 1 through 14 inclusive (commencing Thursday, October 19, 2023, and ending Thursday, January 18, 2024), $25,000 shall be wire transferred by Borrower to Lender each and every Thursday; (ii) for weeks 15 through 20 inclusive (commencing Thursday, January 25, 2024, and ending Thursday, February 29, 2024), $150,000 shall be wire transferred by Borrower to Lender each and every Thursday; and (iii) for weeks 21 through 25 inclusive (thus commencing Thursday, March 7, 2024, and ending Thursday, April 4, 2024), $250,000 shall be wire transferred by Borrower to Lender each and every Thursday (collectively, the "<u>Weekly Payments</u>").

The above Weekly Payments shall each be wire transferred such that they are received by Lender no later than 1 p.m. ET, each and every Thursday, into the following account ("<u>Lender Wire Account</u>"):

> Bank Account Name: BURKE DECOR LLC
> Bank Name: Blue Ridge Bank, N.A.
> Bank Address: 17 West Main Street, Luray, Virginia 22835
> Routing Number: 051402372
> Account Number: 8760683784

2.    **Shopify Bullet Payment.**

Notwithstanding anything to the contrary in the Credit Agreement, Lender hereby consents to Borrower incurring such Third-Party Financing indebtedness from Shopify Capital up to $2,000,000, provided that at least the first $1,000,000 in financing proceeds thereof shall be used to pay down the Obligations ("<u>Shopify Bullet Payment</u>"). In furtherance thereof and as a condition to Lender's consent hereto, on Monday, October 23, 2023, prior to 1 p.m. ET, or if Borrower's closing with Shopify Capital occurs thereafter, then within three (3) business days of said closing, Borrower promises to pay to Lender via wire transfer into the Lender Wire Account said Shopify Bullet Payment. Of the same date, Borrower shall also share with Lender such meaningful financial data demonstrating total funds received from Shopify Capital and thus Borrower's deriving of said Shopify Bullet Payment amount.

DocuSign Envelope ID: 4B777AAA-6DF6-41D5-B1D8-BCFDA42EC66D

### 3.    Excess Cash Bullet Payment.

On January 2, 2024, prior to 1 p.m. ET, Borrower promises to pay to Lender via wire transfer into the Lender Wire Account the greater of: (i) all of Borrower's cash in excess of $2,000,000 or (ii) $250,000 ("Excess Cash Bullet Payment"). Of the same date, Borrower shall also share with Lender such meaningful financial data demonstrating how Borrower exercised commercially-reasonable, prudent financial analysis in deriving the Excess Cash Bullet Payment.

### 4.    Final Payment Due April 11, 2024.

On April 11, 2024, prior to 1 p.m. ET, Borrower promises to pay to Lender via wire transfer into the Lender Wire Account the remaining Balance of Obligations (if any), plus a 3.5% flat fee interest charge ("Flat Fee Charge"), which shall be assessed against same Balance figure (the Balance, plus the Flat Fee Charge, collectively, the "Final Payment"). Notwithstanding the foregoing, if Borrower pays the Balance in full to Lender prior to: (i) April 11, 2024, then the Flat Fee Charge shall be reduced to 3.00%; (ii) March 1, 2024, then the Flat Fee Charge shall be reduced to 2.00%; (iii) February 1, 2024, then the Flat Fee Charge shall be reduced to 1.00%; and (iv) January 1, 2024, then the Flat Fee Charge shall be waived.

### 5.    Secured Corporate Guaranty.

In consideration of Lender's forbearances granted herein and specifically as demonstrated by this Forbearance Agreement, Borrower's affiliates Au Marche LLC and Furnishings LA LLC (collectively, the "Secured Corporate Guarantors") desire to provide to Lender secured corporate guaranties which shall provide for, alongside Borrower, an all-assets, personal property, security interest Collateral grant in favor of Lender pursuant to Section 17 of the Credit Agreement (which section is incorporated hereinto by reference among other sections, see below), all as follows.    The Secured Corporate Guarantors, joint and several to the Borrower, hereby consent to, and agree to be bound by, the Secured Corporate Guaranty (as defined below), as follows:

> **"SECURED CORPORATE GUARANTY.** The guarantors signing below are affiliate companies of the Borrower ("Secured Corporate Guarantors"). Secured Corporate Guarantors each, joint and several to each other and the Borrower, absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and

DocuSign Envelope ID: 4B777AAA-6DF6-41D5-B1D8-BCFDA42EC66D

all Obligations incurred by the Borrower pursuant to the Credit Agreement, which as of today's date, includes but is not limited to a running Balance of Obligations of $7,469,495.00 (this "Secured Corporate Guaranty"). Provided Borrower first incurs an Event of Default under the Credit Agreement, as amended by this Forbearance Agreement, Secured Corporate Guarantors each agree to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower (or against the one or the other Secured Corporate Guarantor). This is a guarantee of payment and not of collection. This is an absolute, unconditional, primary, and continuing obligation and will remain in full force and effect until all the Balance has been indefeasibly paid in full. Furthermore, and not limiting the foregoing in any respect, Secured Corporate Guarantors each consent to, agree to be bound by, and otherwise join into each and every of the following provisions from the Credit Agreement in the same capacity as, and thus alongside and joint and several to Borrower, which provisions for the avoidance of any doubt are hereby incorporated by reference: Sections 17, 18, 19, 20, 22, 23, 25, 26, 28, 29, 32, 33, 34, 35, 36, 39, 45, 46, 47, 48, 50 and 52."

### 6.    Good Faith Cooperation and Business Performance Covenants.

Borrower and Lender agree to cooperate in good faith to ensure that the Balance is paid as agreed hereto. In that spirit, in addition to the representations, warranties and covenants set forth in the Credit Agreement, Borrower agrees: (i) that it shall participate with Lender in a 15-minute standing telephone call or videoconference meeting every Thursday, commencing Thursday, October 12, 2023; (ii) that Borrower shall maintain a minimum capital ratio of 0.70x, which ratio shall be defined as Borrower's current assets divided by current liabilities (including for the avoidance of any doubt the Balance outstanding) as prepared in accordance with GAAP, which financial documents demonstrating said ratio shall be updated and shared in writing each month; (iii) that Borrower shall maintain a minimum Monthly Cashflows of $3,500,000; and (iv) that Borrower shall limit total and cumulative cash outflows to any persons or entities, not otherwise "Borrower" and strictly the following of its affiliates (y) 222 Brand Blvd Realty LLC (though limited to $55,000 for this entity) and (z) 7373 Market Street Realty Holding LLC and 300 Boardman Poland Road Realty LLC (though limited to $35,000 for these two entities), which financial documents demonstrating said limited cash outflows shall be updated and shared in writing the Wednesday prior to said weekly Thursday call as set forth in the preceding subsection (i).

DocuSign Envelope ID: 4B777AAA-6DF6-41D5-B1D8-BCFDA42EC66D

Except for the forbearances explicitly allowed herein, Lender reserves all rights under the Credit Agreement and applicable law. The Parties agree to the terms of this Forbearance Agreement by signing below.

Sincerely,

Anthony Santomo, CEO Ampla, LLC

Borrower hereby consents to, and agrees to be bound by, the terms of this Forbearance Agreement, by its signature below:

**Burke Decor, LLC**

By: _____
Its: MEMBER

Au Marche LLC, as Secured Corporate Guarantor, joint and several to Furnishings LA LLC and the Borrower, hereby consents to, and agrees to be bound by, the Secured Corporate Guaranty as set forth above:

**Au Marche LLC**

By: _____
Its: MEMBER

Furnishings LA LLC, as Secured Corporate Guarantor, joint and several to Au Marche LLC and the Borrower, hereby consents to, and agrees to be bound by, the Secured Corporate Guaranty as set forth above:

**Furnishings LA LLC**

By: _____
Its: MEMBER

February 1, 2024

<u>Via E-mail</u>

Burke Decor, LLC
1419 Boardman-Canfield Road, Ste. 280
Youngstown, OH 44512
Attn: Erin Burke

      **NOTICE OF DEFAULT**
      That certain Growth Line of Credit Agreement, by and between Ampla, LLC, a New York limited liability company ("<u>Lender</u>") and Burke Décor, LLC, an Ohio limited liability company ("<u>Borrower</u>"), dated as of September 27, 2022, (the "<u>Agreement</u>"), as guaranteed by that Limited Guaranty executed by Erin Burke.

Dear Ms. Burke,

      Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Agreement.

      Pursuant to that certain Notice of Event of Default and Opportunity to Cure dated August 17, 2023 ("<u>Notice of Default</u>"), Lender informed Borrower of various Events of Default (as defined in the Notice of Default) under the Agreement, and although under no obligation to do so, Lender granted Borrower a five (5) business day cure period ending August 25, 2023, wherein Lender reserved all rights and remedies under the Agreement and at law.

      Borrower failed to cure the Events of Default within the required time period as set forth in the Notice of Default.

      Subsequent thereto, Lender agreed to enter into a Forbearance Agreement (herein so called) dated October 17, 2023, which also included a "Secured Corporate Guaranty" executed by the Secured Corporate Guarantors (as defined in the Forbearance Agreement), wherein Lender agreed to forbear from exercising its rights under Section 33 of the Agreement in connection with the Events of Default; provided that, Borrower comply with the terms of the Forbearance Agreement.

      Lender hereby notifies Borrower that various defaults ("<u>Forbearance Defaults</u>") have occurred under the terms of the Forbearance Agreement. Specifically, Borrower has breached (i) Section 3 by failing to deliver the Excess Cash Bullet Payment on January 2, 2024, (ii) Section 1 by failing to deliver the Weekly Payment on January 25, 2024, and (iii) Section 6(i) by failing to join the fifteen (15) minute standing telephone call or videoconference meeting on January 25, 2024. Due to the occurrence of the Forbearance Defaults, Lender is no longer under any obligation to comply with the terms of the

Exhibit 4

Forbearance Agreement and may immediately proceed with exercising its remedies for the Events of Default.

You are hereby notified that Lender has not waived, and expressly reserves, all rights and remedies that it may have at law, in equity or under, the Agreement as a result of the Events of Default and/or Forbearance Defaults as described above or any other past, existing or future Event(s) of Default, breach or other default under the Agreement (collectively, "Agreement Defaults"). Subject to the applicable terms of the Agreement, any of such rights or remedies may be exercised by Lender at any time, in its sole discretion.

Additionally, nothing contained herein, nor any failure by Lender to exercise, nor delay by Lender in exercising, any of its rights and remedies at law, in equity or under, the Agreement or the Forbearance Agreement with respect to any past, existing or future Agreement Default, is intended to constitute, nor shall it constitute, any waiver, estoppel, release, modifications, limitation, forbearance or agreement by Lender to forbear or delay the exercise of any of Lender's rights or remedies at law, in equity or under the Agreement or the Forbearance Agreement, or a waiver or modification of any obligations of Borrower under the Agreement or the Forbearance Agreement. Additionally, no failure by Lender to insist upon the strict performance of any term of the Agreement or the Forbearance Agreement, or failure to exercise any right, power or remedy available to it, and no acceptance of full or partial payment of any amount, or performance of any other obligation, before, after or during the continuance of any Agreement Default, shall constitute a waiver or modification of the Agreement or the Forbearance Agreement, or a course of dealing in connection with any such Agreement Default. No express waiver by Lender, if given, of any Agreement Default or potential breach of the Agreement or the Forbearance Agreement shall affect or alter the Agreement or the Forbearance Agreement in any other manner, and the Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach or Agreement Default.

Without limitation of the other provisions of this Notice of Default, the following shall not be construed as a waiver or release of any rights or remedies by Lender or an indication of a course of dealing, and shall not operate as a course of dealing or to toll any cure, grace or notice period or other applicable period or in any manner give rise to an obligation of Lender to modify the legal relationship evidenced by the Agreement or the Forbearance Agreement: (a) the attendance and/or participation by Lender or its attorneys or other representatives in or at any telephone communications, meetings or other discussions with respect to the Agreement Defaults or the Agreement or the Forbearance Agreement; or (b) any correspondence, statements, discussions, negotiations, meetings, drafts of documents (including without limitation, unexecuted drafts of proposed modifications) or telephone or email communications among Lender and/or its attorneys or other representatives and Borrower or Borrower's attorneys or other representatives with respect to any Agreement Default or any proposed transaction or modifications involving the Agreement or the Forbearance Agreement.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Anthony Santomo, CEO Ampla

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| AMPLA, LLC | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| BURKE DECOR, LLC, et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No. 4:24-cv-869

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Burke Decor, LLC
c/of Jerry M. Bryan
Statutory Agent
6 Federal Plaza Central, Suite 1300
Youngstown, OH  44503

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David P. Shouvlin, Esq.
Porter Wright Morris & Arthur, LLP
41 S. High Street
Columbus, Ohio 43215

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 4:24-cv-869

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Case 2:24-bk-12882-BB 24-cv-869 Doc 92 Filed 6:37bc12405Entered 12/30/24 09:00:451 Desc
Main Document    Page 63 of 73
AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| AMPLA, LLC | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. 4:24-cv-869 |
| BURKE DECOR, LLC, et al. | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_    ERIN Burke
6813 Commerce Drive
Hubbard, OH  44503

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David P. Shouvlin, Esq.
Porter Wright Morris & Arthur, LLP
41 S. High Street
Columbus, Ohio 43215

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_SANDY OPACICH, CLERK OF COURT_

Date: _____          _____

_Signature of Clerk or Deputy Clerk_

Civil Action No. 4:24-cv-869

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

AMPLA, LLC                          )
                                    )
                                    )
                                    )
_____   )
        *Plaintiff(s)*               )
        v.                          )     Civil Action No. 4:24-CV-869
BURKE DECOR, LLC, ET AL.            )
                                    )
                                    )
                                    )
_____   )
        *Defendant(s)*               )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    Au Marche, LLC
                                        c/o Erin Burke
                                        Statutory Agent
                                        6813 Commerce Drive
                                        Hubbard, OH  44425

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David P. Shouvlin, Esq.
Porter Wright Morris & Arthur, LLP
41 S. High Street
Columbus, Ohio 43215

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____
                                                    *Signature of Clerk or Deputy Clerk*

Civil Action No. 4:24-CV-869

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                                          *Server's signature*

                                                                          _____
                                                                          *Printed name and title*


                                                                          _____
                                                                          *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| AMPLA, LLC | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| BURKE DECOR, LLC, et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No. 4:24-cv-869

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Furnishings LA, LLC
c/o Christopher J. Newman, Esq.
Statutory Agent
6 Federal Plaza Central, Suite 1300
Youngstown, OH  44503

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David P. Shouvlin, Esq.
Porter Wright Morris & Arthur, LLP
41 S. High Street
Columbus, Ohio 43215

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 4:24-cv-869

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                             *Server's signature*

                                      _____
                                             *Printed name and title*

                                      _____
                                             *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| AMPLA, LLC | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. 4:24-CV-869 |
| BURKE DECOR, LLC, ET AL. | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  U.S. Small Business Administration
2 North 20th Street
Suite 320
Birmingham, AL 35203

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David P. Shouvlin, Esq.
Porter Wright Morris & Arthur, LLP
41 S. High Street
Columbus, Ohio 43215

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____          _____
                                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 4:24-CV-869

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                               *Server's signature*

                                         _____
                                               *Printed name and title*


                                         _____
                                               *Server's address*

Additional information regarding attempted service, etc:

JS 44   (Rev. 09/23)                          **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| AMPLA, LLC | BURKE DECOR, LLC, ERIN BURKE, AU MARCHE, LLC, FURNISHINGS LA, LLC, US SM BUSN ADMIN, CT CORP |

**(b)** County of Residence of First Listed Plaintiff   New York Cty., NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Mahoning Cty., OH
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David P. Shouvlin, McDonald M. Kelly, Porter Wright, 41 S. High S., Columbus, OH 43215; 614.227.2045

Attorneys *(If Known)*

---

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [ ] 2   U.S. Government Defendant
- [ ] 3   Federal Question *(U.S. Government Not a Party)*
- [X] 4   Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [X] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [X] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

---

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & / [ ] 367 Health Care/ Pharmaceutical | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Personal Injury | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability / Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL PROPERTY** | **LABOR** | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [X] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | | [ ] 790 Other Labor Litigation | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | [ ] 550 Civil Rights | | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

---

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

---

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332
Brief description of cause:
Breach of Contract, Breach of Guaranty, Receivership, Sale of Collateral, Accounting

**VII. REQUESTED IN COMPLAINT:**
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ greater than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [X] No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   5-14-2024
SIGNATURE OF ATTORNEY OF RECORD   *DPDL*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

**I.**     Civil Categories: (Please check one category only  ).

  1.  [✔]   General Civil
  2.  [ ]   Administrative Review/Social Security
  3.  [ ]   Habeas Corpus Death Penalty

  *If under Title 28, §2255, name the SENTENCING JUDGE: _____

                              CASE NUMBER: _____

**II.**    **RELATED OR REFILED CASES** See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court
  and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and
  subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for
  the place of holding court in which the case was refiled.  Counsel or a party without counsel shall be responsible for
  bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

  This action: [ ] is **RELATED** to another **PENDING** civil case [ ] is a **REFILED** case [ ] was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**   In accordance with Local Civil Rule   **3.8**, actions involving counties in the Eastern Division shall be filed at any of  the
  divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the
  purpose of determining the proper division, and for statistical reasons, the following information is requested.

  ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH
  PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

  (1)    **Resident defendant**. If the defendant resides in a county within this district, please set forth the name of such
  county
  **COUNTY**: Mahoning County, Ohio
  Corporation **For the purpose of answering the above, a corporation is deemed to be a resident of that county in
  which it has its principal place of business in that district.**

  (2)    **Non-Resident defendant**. If no defendant is a resident of a county in this district, please set forth the county
  wherein the cause of action arose or the event complained of occurred.
  **COUNTY**:

  (3)    **Other Cases**. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle
  place of business within the district, and the cause of action arose or the event complained of occurred outside
  this district, please set forth the county of the plaintiff's residence.
  **COUNTY**:

**IV.**    The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is
  determined in Section  III, please check the appropriate division.

**EASTERN DIVISION**

  [ ]   **AKRON**           **(Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)**
  [ ]   **CLEVELAND**       **(Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga,**
  [✔]   **YOUNGSTOWN**      **Lake, Lorain, Medina and Richland)**
                            **(Counties: Columbiana, Mahoning and Trumbull)**

**WESTERN DIVISION**

  [ ]   **TOLEDO**          **(Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,**
                            **Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca**
                            **VanWert, Williams, Wood and Wyandot)**

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.